# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BANAFSHE ALAVI, | ) |
| | ) |
| Plaintiff, | ) |
| v. | )       Civil Action No. 15-2146 (RBW) |
| | ) |
| KENNETH WEINSTEIN,[1] in his official | ) |
| capacity as Chairman of the Broadcasting | ) |
| Board of Governors, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## <u>MEMORANDUM OPINION</u>

The plaintiff, Banafshe Alavi, brings this civil action against the defendant, Kenneth

Weinstein, in his official capacity as Chairman of the Broadcasting Board of Governors,

asserting claims of gender discrimination and retaliation in violation of the Civil Rights Act of

1964, as amended, 42 U.S.C. §§ 2000e through 2000e-17 (2012) ("Title VII"). See Complaint

("Compl.") ¶¶ 34, 37. Specifically, the plaintiff alleges that the defendant unlawfully

discriminated against her based on her gender and retaliated against her for engaging in prior

protected activity under Title VII when her employment was terminated on April 6, 2007. Id.

Currently before the Court are the Defendant's Motion for Summary Judgment ("Def.'s Summ.

J. Mot.") and the Plaintiff's Motion for Leave to File a Sur-[R]eply in Response to Defendant's

---

[1] Kenneth Weinstein is the current Chairman of the Broadcasting Board of Governors, <u>see</u> The Board, Broad. Bd. of Governors, https://www.bbg.gov/who-we-are/our-leadership/board/kenneth-weinstein/ (last visited Oct. 4, 2018), and he is therefore substituted for Jeffrey Shell as the proper party defendant pursuant to Federal Rule of Civil Procedure 25(d). However, although Weinstein is now the named defendant in this case, the Court will reference the Broadcasting Board of Governors as the defendant throughout this opinion.

Reply ("Pl.'s Sur-Reply Mot."). Upon careful consideration of the parties' submissions,[2] the

Court concludes, for the reasons set forth below, that it must deny both motions.

## I. BACKGROUND

The female plaintiff began working as a contractor with the defendant in 1996. Pl.'s

Facts ¶ 1. On April 16, 2006, she was hired by the defendant as a television production specialist

in its West and South Asia Division of Voice of America's Persian Service. Def.'s Facts ¶ 2;

Pl.'s Resp. ¶ 2. Given her proficiency in Farsi, the plaintiff's duties included "organiz[ing] the

various feeds and videos to coincide with TV dialogue" for "Farsi[-]language shows." Pl.'s

Facts ¶ 2. The plaintiff's employment was subject to a one-year probationary period. Def.'s

Facts ¶ 3; Pl.'s Resp. ¶ 3.

Dominic Bellone, the male executive producer of Voice of America, served as the

plaintiff's immediate supervisor from May 2006 through April 2007. Pl.'s Facts ¶ 3; see also

Pl.'s Summ. J. Opp'n, Exhibit ("Ex.") 3 (Affidavit of Dominic Bellone (Aug. 24, 2007)

("Bellone Aff.")) at 38.[3] The plaintiff served as a line producer of "Roundtable with You," a

political call-in show in Farsi, while Bellone served as its executive producer. Pl.'s Facts ¶ 4.

The plaintiff alleges that, beginning in late 2006 and through February 2007, while she was

under Bellone's supervision, "Bellone harassed [her] constantly in the control room[,] yelling

---

[2] In addition to the filings previously identified, the Court also considered the following submissions in reaching its decision: (1) the Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def.'s Summ. J. Mem."); (2) the Defendant's Statement of Material Facts as to Which There Is No Genuine Issue ("Def.'s Facts"); (3) the Plaintiff's Memorandum of Points and Authorities in Support of Opposition to Motion for Summary Judgment ("Pl.'s Summ. J. Opp'n"); (4) the Plaintiff's Counter-Statement of Material Facts in Support of Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Facts"); (5) the Plaintiff's Responses to Defendant's Statement of Material [Facts] ("Pl.'s Resp."); (6) the Defendant's Reply Memorandum in Support of Motion for Summary Judgment ("Def.'s Summ. J. Reply"); (7) the Plaintiff's Sur-[R]eply in Response to Defendant's Reply Memorandum ("Pl.'s Sur-Reply Mem."); and (8) the Defendant's Opposition to Plaintiff's Motion for Leave to File Sur-[R]eply ("Def.'s Sur-Reply Opp'n").

[3] Because the plaintiff often includes multiple documents within each exhibit, the Court cites to the Bates numbering at the top righthand corner of the documents, rather than the original numbering in the documents, when referring to the plaintiff's exhibits.

'almost every time that [she] was in line producing.'" Id. ¶ 5 (third alteration in original). According to the plaintiff, Bellone also "challenged her every action, even her restroom visits." Id.

"In the second week of February 2007[, the p]laintiff organized a meeting for staff to express to senior managers complaints about Bellone's behavior." Pl.'s Facts ¶ 14; see also Pl.'s Summ. J. Opp'n, Ex. 3 (Affidavit of Benjamin Jonas-Keeling (Aug. 24, 2007) ("Jonas Aff.")) at 42; id., Ex. 3 (Affidavit of Kambiz Mahmoudi (Sept. 7, 2007) ("Mahmoudi Aff.")) at 47. During the meeting, the plaintiff was "'quite outspoken' as to [the] mistreatment she suffered from Mr. Bellone," "complain[ing] that Bellone treated less experienced males better than her," and that "Bellone was 'loud and disruptive.'" Pl.'s Facts ¶ 15. Dr. Kambiz Mahmoudi, the executive director of the Persian Service, id. ¶ 12, and Benjamin Jonas, then known as Benjamin Jonas-Keeling, Def.'s Facts ¶ 8, the staff director of the Persian Service, id. ¶ 11, attended the meeting on behalf of management, Pl.'s Facts ¶ 15; Pl.'s Summ. J. Opp'n, Ex. 3 (Jonas Aff.) at 42; id., Ex. 3 (Mahmoudi Aff.) at 47.

Approximately two weeks later, on or about March 1, 2007, the plaintiff met with Bellone and Jonas to discuss the plaintiff's alleged "workplace problems, including absenteeism, tardiness, inappropriate behavior towards a supervisor, and [her] sign-in/out times." Pl.'s Summ. J. Opp'n, Ex. 3 (Letter from Sheila Gandji to Banafshe Alavi (Apr. 6, 2007) ("Termination Letter")) at 34; see also Pl.'s Facts ¶¶ 23–24; Def.'s Facts ¶ 22. On March 16, 2007, Jonas "requested entry and exit data[4] relating to [the plaintiff] from the building security office," Pl.'s Facts ¶ 27; see also Def.'s Facts ¶ 19, compared this data to the plaintiff's physical sign-in sheets for the Persian Service, Pl.'s Facts ¶ 27; Def.'s Facts ¶ 11, and allegedly "uncovered false sign-in

---

[4] This data is known as "the Access Control System journal or data." Pl.'s Facts ¶ 27.

times," Pl.'s Summ. J. Opp'n, Ex. 3 (Termination Letter) at 34; see also Def.'s Facts ¶ 11.

Thereafter, Bellone consulted with Mahmoudi, Jonas, and Donna Grace, the human resources

director, regarding possibly terminating the plaintiff's employment. Pl.'s Summ. Opp'n, Ex. 5

(Agency's Responses to Complainant's First Set of Interrogatories and Requests for Production

("Def.'s Interrog. Resp.")) at 81; see also Pl.'s Facts ¶ 29. The plaintiff was subsequently

terminated on April 6, 2007, for "falsification of time and attendance records." Pl.'s Summ. J.

Opp'n, Ex. 3 (Termination Letter) at 34; see also Def.'s Facts ¶ 24.

The plaintiff filed a complaint with the Equal Employment Opportunity Commission (the

"EEOC") on June 18, 2007, "alleging that the [defendant] discriminated against her on the bases

of national origin (Iranian), sex (female), and reprisal for prior protected EEO [ ] activity." Pl.'s

Summ. J. Opp'n, Ex. 2 (EEOC Appeal Decision (Sept. 11, 2015) ("EEOC Decision")) at 21.

Following the issuance of an opinion by one of its Administrative Judges, the EEOC found that

there was "substantial evidence in the record to support the [Administrative Judge's] findings of

unlawful employment discrimination based on sex and reprisal with respect to the harassment

allegation," id., Ex. 2 (EEOC Decision) at 24, but concluded that the plaintiff "did not

demonstrate that the [Administrative Judge] erred in finding that she did not establish [that] her

termination was discriminatory," id., Ex. 2 (EEOC Decision) at 25.

On December 10, 2015, the plaintiff initiated this civil action, asserting that "[t]he

[defendant's] decision to terminate [her] employment on or about April 6, 2007[,] was based on

intentional sex discrimination" and "intentional retaliation and/or reprisal for her prior protected

EEO activity in violation of Title VII." Compl. ¶¶ 34, 37. The defendant requests summary

judgment on the ground that the "[p]laintiff cannot present sufficient evidence that would permit

a reasonable fact finder to conclude that she was discriminated against because of her gender or

that she was retaliated against because of prior EEO activity."  Def.'s Summ. J. Mem. at 1.  The

plaintiff opposes the defendant's motion, <u>see generally</u> Pl.'s Summ. J. Opp'n, and has filed a

motion for leave to file a sur-reply to respond to the defendant's summary judgment reply, <u>see

generally</u> Pl.'s Sur-Reply Mot.   This opinion resolves these motions.

## II.     STANDARDS OF REVIEW

### A.     Motion for Leave to File a Sur-Reply

A court will grant a motion for leave to file a sur-reply if "the party making the motion

would be unable to contest matters presented to the court for the first time in the opposing

party's reply."  <u>Lewis v. Rumsfeld</u>, 154 F. Supp. 2d 56, 61 (D.D.C. 2001); <u>see also</u> <u>Ben-Kotel v.

Howard Univ.</u>, 319 F.3d 532, 536 (D.C. Cir. 2003).  Although "sur[-]replies are generally

disfavored," <u>Kifafi v. Hilton Hotels Ret. Plan</u>, 736 F. Supp. 2d 64, 69 (D.D.C. 2010), <u>aff'd</u> 701

F.3d 718 (D.C. Cir. 2012), "[t]he decision to grant or deny leave to file a sur-reply is committed

to the sound discretion of the Court," <u>Lu v. Lezell</u>, 45 F. Supp. 3d 86, 91 (D.D.C. 2014).  "In

exercising its discretion, the [C]ourt should consider whether the movant's reply in fact raises

arguments or issues for the first time, whether the nonmovant's proposed sur[-]reply would be

helpful to the resolution of the pending motion, and whether the movant would be unduly

prejudiced were leave to be granted."  <u>Banner Health v. Sebelius</u>, 905 F. Supp. 2d 174, 187

(D.D.C. 2012).

If new arguments appear for the first time in a movant's reply, granting leave to file a sur-

reply is appropriate.  <u>See</u> <u>Flynn v. Veazey Constr. Corp.</u>, 310 F. Supp. 2d 186, 189 (D.D.C.

2004).  But such arguments "must be truly new."  <u>United States ex rel. Pogue v. Diabetes

Treatment Ctrs. of Am., Inc.</u>, 238 F. Supp. 2d 270, 277 (D.D.C. 2002).  The alleged

mischaracterization of a moving party's position by an opponent in a reply is insufficient to

justify granting a request to file a sur-reply.  See Lewis, 154 F. Supp. 2d at 61.  "Simply put, a sur[-]reply is not a vehicle for rehashing arguments that have already been raised and briefed by the parties.  Were that not true, briefing would become an endless pursuit."  Crummey v. Soc. Sec. Admin., 794 F. Supp. 2d 46, 63 (D.D.C. 2011), aff'd No. 11-5231, 2012 WL 556317 (D.C. Cir. Feb. 6, 2012).

### B.      Motion for Summary Judgment

Courts will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in h[er] favor."  Anderson, 477 U.S. at 255.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ."  Id.  The movant has the burden of demonstrating the absence of a genuine issue of material fact and that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In responding to the summary judgment motion, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citing cases).  Accordingly,

the non-moving party must not rely on "mere allegations or denials . . . but must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson, 477 U.S. at 248 (one ellipsis omitted) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)). Thus, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position [is] insufficient" to withstand a motion for summary judgment, as "there must be [some] evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

### III.   ANALYSIS

#### A.   The Plaintiff's Motion for Leave to File a Sur-Reply

The plaintiff requests leave to file a sur-reply, arguing that the defendant's reply in support of its motion for summary judgment "conflates arguments raised in [the] [p]laintiff's [o]pposition and raises new matters that deserve clarification." Pl.'s Sur-Reply Mot. at 1. Specifically, she argues that the defendant's reply (1) "misstates the basic facts" with respect to the timeline of the plaintiff's termination, Pl.'s Sur-Reply Mem. at 1; (2) "does not address [the] [p]laintiff's legal points that the finding of the EEOC of harassment and retaliation from December 2006 to February 2007 are binding on [the] [d]efendant and this proceeding," id. at 2; (3) "tries to minimize the illegal removal of [thirty-two] hours of prior approved leave," id. at 3; (4) cites the wrong article of the Negotiated Labor Management Agreement (the "Agreement"), which governed the termination of probationary employees, id. at 6; (5) "does not defend the accuracy of the Access Control System [ ] data in opposition to [t]he [p]laintiff's careful evidence that the [Access Control System] time information was notoriously flawed," id. at 6–7; and (7) argues that "no bad faith was shown as to the destruction of emails by Dr. Mahmoudi and [ ] Dr. Mahmoudi's emails did not constitute 'personnel and employment records made or kept by an employer,'" id. at 8 (quoting 29 C.F.R. § 1602.14 (2012)). The defendant responds that

leave to file a sur-reply is not warranted because it "did not raise any new matters in the reply but, rather, further developed arguments that had been raised in the opening motion in response to specific arguments made by [the] [p]laintiff in her opposition or responded to new arguments raised for the first time in [the] [p]laintiff's opposition."  Def.'s Sur-Reply Opp'n at 3.  The Court agrees with the defendant.

The plaintiff has not identified any new issues that were raised for the first time in the defendant's reply.  See Robinson v. Detroit News, Inc., 211 F. Supp. 2d 101, 113 (D.D.C. 2002) (denying a motion for leave to file a sur-reply "because the proposed sur[-]reply merely reiterate[d] arguments already made and [did] not add anything new").  The plaintiff acknowledges that she seeks leave to file a sur-reply to correct the defendant's alleged misstatement of facts, see Pl.'s Sur-Reply Mem. at 1, 3, 6, and to further clarify issues raised in her opposition, see id. at 2, 6–7, 8.  However, neither of these reasons serves as the basis for granting a motion for leave to file a sur-reply.  See Nix El v. Williams, 174 F. Supp. 3d 87, 92 (D.D.C. 2016) ("The purpose of a sur[-]reply is to enable the non-movant to contest matters presented for the first time in the opposing party's reply.  A sur[-]reply may not be used simply to correct an 'alleged mischaracterization' or to reiterate arguments already made."  (citations omitted)).  Thus, because the plaintiff fails to identify new issues raised for the first time in the defendant's reply, the Court denies the plaintiff's request for leave to file a sur-reply.

**B.     The Defendant's Motion for Summary Judgment**

**1.     The Plaintiff's Gender Discrimination Claim**

At the summary judgment stage, "when [a] plaintiff offers direct evidence of discriminatory intent, that evidence will 'generally entitle a plaintiff to a jury trial.'"  Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 576 (D.C. Cir. 2013) (quoting Vatel v. All. of Auto Mfrs., 627

F.3d 1245, 1247 (D.C. Cir. 2011)).  However, in the absence of direct evidence of discrimination, the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies in assessing the plaintiff's discrimination claim.  Accordingly, there being no direct evidence of discrimination, the plaintiff must "make[] out a prima facie case of disparate-treatment discrimination 'by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'"  Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007) (quoting George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005)).  Once this prima facie case of discrimination is established, the defendant must identify a legitimate, nondiscriminatory reason for the adverse employment action.  See McDonnell Douglas, 411 U.S. at 802.  However, where the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, this Circuit has held that "the McDonnell Douglas inquiry distills into one question: '[whether] the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee . . . .'"  Evans v. Sebelius, 716 F.3d 617, 620 (D.C. Cir. 2013) (quoting Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008)).  Thus, "the prima-facie-case aspect of McDonnell Douglas is irrelevant when an employer has asserted a legitimate, nondiscriminatory reason for its decision."  Adeyemi v. District of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008).  And, "[c]onsistent with the courts' reluctance to become involved in the micromanagement of everyday employment decisions, the question before the [C]ourt is limited to whether [the plaintiff has] produced sufficient evidence of [ ] discrimination, not whether [s]he was treated fairly."  Forman v. Small, 271 F.3d 285, 291 (D.C. Cir. 2001) (citations omitted).

Under the McDonnell Douglas framework,[5] the threshold question for the Court to resolve in this case is whether the defendant has stated a legitimate, nondiscriminatory reason for the plaintiff's termination.  At this stage of that analysis, the defendant's burden of stating a legitimate, nondiscriminatory reason for the adverse employment action is one of production; accordingly, the defendant "need not persuade the [C]ourt that [the adverse employment action] was actually motivated by the proffered reasons."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981) (emphasis added).  Here, the defendant points to the plaintiff's excessive absenteeism, tardiness, and time falsifications as legitimate, nondiscriminatory reasons for the plaintiff's termination.  See Def.'s Summ. J. Mem. at 6; see also Def.'s Summ. J. Mot., Ex. 4 (Jan. 25, 2007 E-mail from Dominic Bellone to Banafshe Alavi ("Jan. 25, 2007 E-mail")) ("I am troubled by your repeated lack of punctuality in getting to the office on time.  Life is uncertain and I'm fairly flexibl[e] when you need to come in late or leave early but this should not be a

---

[5] The plaintiff first argues that the Court need not evaluate her discrimination claim under the McDonnell Douglas framework because she has presented direct evidence of discrimination and retaliation, explaining that "[t]he final finding of discrimination and retaliation by [the] EEOC for the period [of] November 2006 through February 2007 by the same office and the same management that terminated [the] [p]laintiff constitutes incontrovertible evidence of retaliatory and discriminatory animus and action" and "is entitled to preclusive effect."  Pl.'s Summ. J. Opp'n at 6–7 (citing B & B Hardware, Inc. v. Hargis Indus., Inc., __ U.S. at __, 135 S. Ct. 1293, 1303 (2015)).  Although certain administrative findings may be entitled to preclusive effect, see B & B Hardware, __ U.S. at __, 135 S. Ct. at 1303 ("[W]here a single issue is before a court and an administrative agency, preclusion [ ] often applies."), "it is settled that decisions by the EEOC do not preclude a trial de novo in federal court," Kremer v. Chem. Constr. Corp., 456 U.S. 461, 470 n.7 (1982) (emphasis removed); see also Harrigan v. Yang, 168 F. Supp. 3d 25, 36 (D.D.C. 2016) ("Title VII provides for de novo review of [the p]laintiff's discrimination claim in federal court, regardless of the outcome before the EEOC." (emphasis removed)).  As the Fourth Circuit has explained,

> [f]ederal anti-discrimination statutes embody a strong presumption in favor of judicial resolution of disputed questions of fact.  Prior administrative findings, whatever result may be reached, are ordinarily not entitled to preclusive effect in a subsequent administrative suit, even though the same facts are in dispute.  Whether the prior administrative findings be those of the Civil Service Commission, the EEOC, or any other federal agency is immaterial.  The plain lesson of Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974), and Chandler v. Roudebush, 425 U.S. 840 (1976), is that Congress entrusted the ultimate resolution of questions of discrimination to the federal judiciary.

Rosenfeld v. Dep't of Army, 769 F.2d 237, 239 (4th Cir. 1985).  Because the Court concludes that the EEOC findings are not direct evidence of discrimination, the Court will proceed with analyzing the plaintiff's discrimination claim under the McDonnell Douglas burden-shifting framework.

weekly, sometimes daily, occurrence.  The last 3–4 Thursdays you have not shown up for work

nor have you given any reason . . . .”); id., Ex. 5 (E-mail chain between Joy Wagner and Dominic

Bellone (Feb. 7, 2007) (“Feb. 5, 2007 E-mail”)) (“Dom, you have a serious problem on your

hands.  Several people rolled their eyes on the RT staff when I said [the plaintiff] ha[d] called in

sick.”); id., Ex. 11 (EEOC Hearing Transcript, Vol. 2, Testimony of Amy Katz (June 25, 2008)

(“Katz Test.”)) at 350:18–19 (testifying that the plaintiff “was late quite a lot, called in sick quite

a lot”); id., Ex. 12 (EEOC Hearing Transcript, Vol. 1, Testimony of Benjamin Jonas-Keeling

(June 24, 2008) (“Jonas Test.”)) at 81:16–19 (“During the middle of the workday, [the plaintiff]

would often be very difficult to locate, or impossible to locate.  She would just be gone for hours

at a time.”).  With this evidence, the Court concludes that the defendant has stated legitimate,

nondiscriminatory reasons for the plaintiff’s termination.

    The Court next considers whether the plaintiff has proffered sufficient evidence for a

reasonable jury to conclude that the defendant’s stated reasons for the adverse employment

action are pretextual.  See Evans, 716 F.3d at 620.  This Circuit has explained that

> [a] plaintiff may support an inference that her employer’s stated reasons for
> undertaking the adverse employment action in question were pretextual by citing a
> number of possible sources of evidence, including “the employer’s better treatment
> of other similarly situated employees outside the plaintiff’s protected group, its
> inconsistent or dishonest explanation, its deviation from established procedures or
> criteria, [ ] the employer’s pattern of poor treatment of other employees in the same
> protected group as the plaintiff, or other relevant evidence that a jury could
> reasonably conclude evinces an illicit motive.”

Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1115 (D.C. Cir. 2016) (second alteration in

original) (quoting Walker v. Johnson, 798 F.3d 1085, 1092 (D.C. Cir. 2015)).

    As evidence of pretext, the plaintiff argues that similarly-situated male employees were

treated with more lenity than female employees.  See Pl.’s Summ. J. Opp’n at 24.  The plaintiff

first offers evidence that Bellone treated male producers with less experience more favorably

than her and other female employees.  See id., Ex. 3 (Affidavit of Frederick Reed ("Reed Aff."))

at 51 ("In looking back upon it, my impression is that Mr. Bellone did not spend as much time in

the control room when one of the two male producers with less experience w[as] there.  On the

other hand, it seemed that he hovered about in the control room more often when the females

(especially [the plaintiff]) were producing.  With experienced producers such as [the plaintiff] at

the helm, one would think that would require the least amount of involvement and presence from

the [executive producer]."); id., Ex. 3 (Affidavit of Hamideh Aramideh (Aug. 24, 2007)

("Aramideh Aff.")) at 56 ("Q: Do you perceive that the manner in which Mr. Bellone treats

female employees is different from the manner in which he treats the male employees? . . . .

A: Yes.  Because I would see, when I was the host of 'A Roundtable with You' show, he would

treat me differently than the way he would treat male hosts.  The male hosts would get

preferential treatment all the time."); id., Ex. 21 (EEOC Hearing Transcript, Vol. 1, Testimony of

Hamideh Aramideh (June 24, 2008) ("Aramideh Test.")) at 242:9–22 ("Q: [Bellone] may stand

behind [the plaintiff] and pick at her sort of like criticize her, correct?  A: Yes, yes.  Q: Did he do

that to you?  A: Yes . . . .  Q: You think it's based on male versus female?  A: Male and female,

yeah.  I strongly believe that.").  The defendant does not address Bellone's purported differing

treatment of male and female employees in its reply, but rather, argues that the "[p]laintiff has

failed to produce any evidence that would permit a jury to find that Mr. Jonas Keeling or Ms.

Sheila Gandji, the deciding official, had any discriminatory or retaliatory animus."  Def.'s

Summ. J. Reply at 4.

     The plaintiff also argues that the defendant disciplined similarly situated male employees

less harshly than her.  See Pl.'s Summ. J. Opp'n at 24 (noting that one male broadcaster, Mr.

Nateghi, was reassigned to a different office, while another male broadcaster, Mr. RR, was given

a five-day suspension); see also id., Ex. 22 (EEOC Hearing Transcript, Vol. 2, Testimony of

Behnam Nateghi (June 25, 2008) ("Nateghi Test.")) at 310:2–18  (indicating that Mr. Nateghi

was reassigned to a different office, but that the reassignment had nothing to do with the

complaints launched against him); id., Ex. 20 (Mr. RR's Disciplinary Notices ("RR Disciplinary

Nots.")) at 172 (indicating that Mr. RR received a five-day suspension for the complaints

launched against him).  The defendant counters that the two male employees identified by the

plaintiff are not similarly situated to the plaintiff because (1) they were both broadcasters, while

the plaintiff was a producer; (2) they were not supervised by the same person as the plaintiff; and

(3) Mr. RR was past his probationary period, whereas the plaintiff was not.  See Def.'s Summ. J.

Reply at 10.

      "It is well established that, to be successful in the use of comparator evidence, 'the

plaintiff must point to a similarly situated employee outside of a protected class who committed

comparable offenses but who was punished less severely by the same deciding official.'"  Sledge

v. District of Columbia, 63 F. Supp. 3d 1, 17–18 (D.D.C. 2014) (emphasis removed) (quoting

White v. Tapella, 876 F. Supp. 2d 58, 80 (D.D.C. 2012)).  Here, the plaintiff has not shown that

Messrs. Nateghi and RR held the same positions that she did, compare Def.'s Facts ¶ 2

(indicating that the plaintiff was a television production specialist), and Pl.'s Resp. ¶ 2 (same),

with Pl.'s Summ. J. Opp'n, Ex. 20 (RR Disciplinary Nots.) at 170 (indicating that Mr. RR was a

radio broadcaster), and id., Ex. 22 (Nateghi Test.) at 306:6–11 (indicating that Mr. Nateghi was a

television broadcaster), or committed similar offenses as her, compare id., Ex. 3 (Termination

Letter) at 34 (indicating that the plaintiff was disciplined for falsifying her time and attendance

records), with id., Ex. 20 (RR Disciplinary Nots.) at 170 (indicating that Mr. RR was disciplined

for exhibiting "disrespectful behavior to a supervisor"), and id., Ex. 22 (Nateghi Test.) at

308:20–310:1 (indicating that Mr. Nateghi was disciplined for using inappropriate language). The plaintiff has therefore offered no evidence of similarly situated comparators with respect to the defendant's allegedly disparate disciplinary actions. See McGill v. Munoz, 203 F.3d 843, 848 (D.C. Cir. 2000) (finding no intentional discrimination where the plaintiff "offered no evidence that employees with similarly suspicious patterns of absenteeism were treated any differently than she was").

As additional evidence of pretext, the plaintiff also argues that the defendant deviated from standard procedures by relying on the Access Control System information to dispute the plaintiff's handwritten time entries, see Pl's Summ. J. Opp'n at 25, and by failing to provide the plaintiff with notice and an opportunity to respond before taking adverse action against her, see id. at 23. Regarding the use of Access Control System information to verify the plaintiff's time and attendance entries, the defendant counters that the "[p]laintiff fails to acknowledge that the [Access Control System] [ ] has also been an accepted method of time and attendance verification." Def.'s Summ. J. Reply at 11. The defendant points to Article 5 of the Agreement, which provides that "[Access Control System] computer records may be accessed for time and attendance verification." Pl.'s Summ. J. Opp'n, Ex. 4 (Agreement) at Art. 5, § 1(j). Regarding the alleged failure to provide the plaintiff with notice and an opportunity to be heard, the defendant counters that the plaintiff was a probationary employee and "that actions concerning probationary terminations are specifically excluded from coverage under Article 21, Section 2(b)(7) of the [Agreement]," Def.'s Summ. J. Reply at 8, and under Office of Personnel Management (the "OPM") regulations, id. (citing 5 C.F.R. § 752.201(b)(1) (2010)).

As a preliminary matter, the Court notes that the defendant relies on the incorrect Agreement provision and OPM regulation. As to the applicable Agreement provision, Article

20—not Article 21—governs procedures related to discipline and adverse actions.  Compare Pl.'s Summ. J. Opp'n, Ex. 4 (Agreement) at Art. 20 (discipline and adverse actions), with Def.'s Summ. J. Mot., Ex. 30 (Agreement) at Art. 21 (negotiated grievance procedure).  And, as to the applicable OPM regulation, 5 C.F.R. § 752.401—not 5 C.F.R. § 752.201—governs termination procedures for employees.  Compare 5 C.F.R. § 752.201 through 752.03 (regulatory requirements for suspensions of fourteen days or less), with 5 C.F.R. § 752.401 through 752.406 (regulatory requirements for removal or suspension of more than fourteen days).  Regardless, the defendant is correct that neither the Agreement nor the OPM regulations provide for procedural protections to probationary employees in the event of removal.  See 5 C.F.R. § 752.401(c)(1) (covering "[a] career or career conditional employee in the competitive service who is not serving a probationary or trial period" (emphasis added)); Pl.'s Summ. J. Opp'n, Ex. 4 (Agreement) at Art. 20, § 1(a) (expressly incorporating 5 C.F.R. § 752).  Because the plaintiff has not shown that the defendant's use of Access Control System information or its failure to provide the plaintiff—a probationary employee—with procedural protections in advance of her termination "'deviat[ed] from established procedures or criteria,'" the Court concludes that these actions by the defendant do not merit an inference of pretext.  See Wheeler, 812 F.3d at 1115 (quoting Walker, 798 F.3d at 1092).

Despite not finding all of the plaintiff's arguments persuasive, drawing all reasonable inferences in favor of the plaintiff, the Court does find that the plaintiff has "'support[ed] an inference that her employer's stated reasons for undertaking the adverse employment were pretextual by citing . . . [Bellone's] poor treatment of other employees in the same protected group as the plaintiff.'"  See Wheeler, 812 F.3d at 1115 (quoting Walker, 798 F.3d at 1092).  The Court must therefore deny the defendant's motion for summary judgment on the plaintiff's

discrimination claim.

## 2. The Plaintiff's Retaliation Claim

"To prove retaliation, the plaintiff generally must establish that . . . she suffered (i) a materially adverse action (ii) because . . . she had brought or threatened to bring a discrimination claim." Baloch v. Kempthorne, 550 F.3d 1191, 1198 (D.C. Cir. 2008). Retaliation claims are also governed by the burden-shifting framework adopted in McDonnell Douglas. See Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009) (citing Carter v. Geo. Wash. Univ., 387 F.3d 872, 878 (D.C. Cir. 2004)). "Under that framework, a plaintiff must first establish a prima facie case of retaliation by showing (1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by h[er] employer; and (3) that a causal link connects the two." Id. (citing Wiley v. Glassman, 511 F.3d 151, 155 (D.C. Cir. 2007)). Importantly, this "standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69 (2006). However, just like a discrimination claim, once an employer produces a legitimate, nondiscriminatory reason for the adverse action, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer intentional . . . retaliation from all the evidence," Carter, 387 F.3d at 878. And, "'positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine true.'" Allen v. Johnson, 795 F.3d 34, 47 (D.C. Cir. 2015) (quoting Hamilton v. Geithner, 666 F.3d 1344, 1359 (D.C. Cir. 2012) (Hamilton IV)).

Because the Court concludes that the defendant has offered legitimate, nondiscriminatory reasons for the plaintiff's termination, see supra Part III.B.1, the Court proceeds to whether the

plaintiff has offered sufficient evidence to defeat the presumption that the defendant's reasons for terminating the plaintiff are true, see Carter, 387 F.3d at 878.

As a preliminary matter, a period of approximately one-and-a-half months elapsed between the plaintiff's protected activity and her termination. See Pl.'s Facts ¶ 14 (indicating that the plaintiff's protected activity occurred during "the second week of February 2007); Def.'s Facts ¶ 24 (indicating that the plaintiff was terminated on April 6, 2007); Pl.'s Facts ¶ 26 (same). Courts in this Circuit have generally accepted as adequate intervals "of a few days up to a few months," Payne v. Salazar, 899 F. Supp. 2d 42, 58 (D.D.C. 2012); see also Dudley v. Wash. Metro. Area Transit Auth., 924 F. Supp. 2d 141, 179 (D.D.C. 2013) (noting that a six-month interval is "the outer edge of acceptable temporal proximity"). The Court finds that the plaintiff's protected activity and termination were sufficiently close in time to establish temporal proximity.

In addition to the temporal proximity between the plaintiff's protected activity and her termination, see Allen, 795 F.3d at 47, the plaintiff argues that "Bellone's involvement throughout . . . the [termination] investigation [ ] reinforces [the defendant's] discriminatory and retaliatory intent." Pl.'s Summ. J. Opp'n at 20. The plaintiff offers evidence that Bellone was involved in the decision to terminate her, see id., Ex. 5 (Def.'s Interrog. Resp.) at 81 (identifying Bellone as a "person who was consulted or involved with the decision to terminate the employment of [the plaintiff] in April 2007"); id., Ex. 13 (Deposition of Benjamin Jonas-Keeling (Apr. 21, 2008 ) ("Jonas Dep.")) at 32:7–10 ("Q: And did anybody else recommend termination [of the plaintiff]? A: Yes. Q: Who? A: Joy Wagner, Dominic Bellone."), and that Bellone was aware of the protected activity, see id., Ex. 3 (Affidavit of Faraj Ardalan (Aug. 29, 2007) ("Ardalan Aff.")) at 54 ("For a short period [of time after the February 2012 meeting,] [Bellone]

was removed, but a few days later, he returned . . . .  As soon as he returned, his attitude changed for the worse, he came back with more authority, and he felt victorious.  He started planning against those whom he felt were more threatening and [o]f course [the plaintiff] was one of them.").  Knowledge of an employee's protected activity by those involved in the decision to take adverse employment action against the employee may be probative of pretext.  Cf. Kennedy v. Nat'l R.R. Passenger Corp., 139 F. Supp. 3d 48, 67 (D.D.C. 2015) (finding no pretext because "the plaintiff has not shown who, if anyone, involved with the decision to [take the adverse employment action], was even aware of [the protected activity]"); Hudson v. Nat'l Acad. of Scis., Inst. of Med., 816 F. Supp. 774, 779 (D.D.C. 1993) (finding no pretext where "none of the persons involved in the decisionmaking on these positions . . . knew of the plaintiff's protected activity until well after [the adverse employment action was taken]").  Considering that the plaintiff specifically spoke out against him at the February 2007 meeting, Pl.'s Facts ¶ 15, Bellone's awareness of the plaintiff's protected activity and his involvement in the decision to terminate her employment renders the defendant's proffer of legitimate, nondiscriminatory reasons for her termination suspect.

The plaintiff next asserts that "Jonas instructed the timekeeper Raefer Warner to alter [the] [p]laintiff's accumulated leave balances without notice to her to make retroactive deductions from [the] [p]laintiff's leave account . . . whereby some [thirty-two] hours were deducted from her leave account in March 2007," and subsequently issued her a warning regarding her "'extremely low' leave balances."  Pl.'s Summ. J. Opp'n at 3.  The plaintiff points to Warner's testimony as evidence of this allegation.  See id., Ex. 21 (EEOC Hearing Transcript, Vol. 1, Testimony of Raefer Warner (June 24, 2008) ("Warner Test.")) at 276:14–277:7 ("Q: Did there ever come a time in early 2007 that you made some retroactive changes to [the plaintiff's]

leave and attendance account?  A: Yes . . . . Q: What brought it about?  A: It was done because Benjamin Jonas-Keeling requested it.").  But see id., Ex. 21 (Jonas Test.) at 84:7–14, 100:3–6 (indicating that Jonas recalled instructing Warner to change an entry in the plaintiff's time and attendance account from "sick leave" to "annual leave," but that he did "not recall" "asking [ ] Warner to make any [other] changes to her time and attendance" account).  The plaintiff also offers evidence that Jonas was aware of the plaintiff's protected activity, see Pl.'s Facts ¶ 15 (indicating that Jonas was present at the February 2007 meeting); Pl.'s Summ. J. Opp'n, Ex. 3 (Jonas Aff.) at 42 (same), and, like Bellone, was involved in the decision to terminate her, see id., Ex. 13 (Jonas Dep.) at 32:5–6 ("Q: And what advice did you give to the director?  A: I recommended termination [of the plaintiff].");  id., Ex. 5 (Def.'s Interrog. Resp.) at 81 (identifying Jonas as a "person who was consulted or involved with the decision to terminate the employment of [the plaintiff] in April 2007").

The defendant responds that Jonas's "adjustment to [the] [p]laintiff's time and attendance for accuracy does not constitute pretext," and "there is no indication in the record that Mr. Bellone had any [role] in these actions."  Def.'s Summ. J. Reply at 7.  However, regardless of whether Bellone was directly involved in the decision to deduct the plaintiff's leave balance, the facts that Bellone and Jonas together met with the plaintiff on or about March 1, 2007, to discuss the plaintiff's purported "workplace problems, including absenteeism, tardiness, inappropriate behavior toward a supervisor, and [her] sign-in/out times," see Pl.'s Summ. J. Opp'n, Ex. 3 (Termination Letter) at 34, and that the plaintiff's low leave balance was one of the reasons that the defendant used to justify the plaintiff's termination, see id., Ex. 3 (Termination Letter) (noting that the plaintiff's "workplace problems[] include[ed] absenteeism[]") at 34; Def.'s Summ. J. Mot., Ex. 29 (Affidavit of Sheila Gandji (Aug. 17, 2007) ("Gandji Aff.")) ("Staff

Director Benjamin Jonas-Keeling initiated the termination and provided evidence consisting of [the plaintiff]'s Time and Attendance records and security logs."); see also id., Ex. 8 (Mar. 15, 2007 E-mail from Benjamin Jonas-Keeling to Banafshe Alavi ("Mar. 15, 2007 E-mail")) ("Please note that your annual leave and sick balances are extremely low."), the deduction of the plaintiff's leave balance at the direction of Jonas—an individual who was aware of the plaintiff's protected activity, worked closely with Bellone, and was involved in the decision to terminate the plaintiff—also renders the defendant's proffer of legitimate, nondiscriminatory reasons for her termination suspect.

Drawing all reasonable inferences in favor of the plaintiff, see Anderson, 477 U.S. at 255, the Court finds that the six-week temporal proximity between the protected activity and the plaintiff's termination, coupled with Bellone's and Jonas's knowledge of the plaintiff's protected activity and their involvement in her termination, would allow a reasonable jury to conclude that the plaintiff was retaliated against for engaging in protected activity. Accordingly, the Court will deny the defendant's motion for summary judgment on the plaintiff's retaliation claim.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that the plaintiff's proposed sur-reply fails to identify new issues raised for the first time in the defendant's reply, and therefore was not considered in resolving the defendant's motion for summary judgment. The Court also finds that the plaintiff's termination, coupled with her proffer of evidence rebutting the defendant's explanation for her termination, is sufficient to establish pretext and for a reasonable juror to infer both discrimination and retaliation. Accordingly, the Court will deny the plaintiff's motion for leave to file a sur-reply and the defendant's motion for summary judgment.[6]

---

[6] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.

**SO ORDERED** this 4th day of October, 2018.

REGGIE B. WALTON
United States District Judge
