## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BANAFSHE ALAVI,<br><br>    Plaintiff,<br><br>  v.<br><br>AMANDA BENNETT, in her official<br>capacity as Chief Executive Officer of<br>the U.S. Agency for Global Media,[1]<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 15-2146 (RBW) |

## <u>MEMORANDUM OPINION</u>

The plaintiff, Banafshe Alavi, brought this civil action against the defendant, Amanda

Bennett, in her official capacity as Chief Executive Officer of the United States Agency for

Global Media, asserting claims of gender discrimination and retaliation in violation of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e through 2000e-17 ("Title VII").  See

Complaint ("Compl.") ¶¶ 34, 37, ECF No. 1.  Currently pending before the Court are: (1) the

components of the Plaintiff's Motion for Award of Equitable Relief ("Pl.'s Mot." or the

"plaintiff's motion"), ECF No. 108, that the Court previously held in abeyance, <u>see</u> Order at 1

(Jan. 7, 2021), ECF No. 114; and (2) the Plaintiff's First Supplemental Motion for Award of

Attorneys' Fees and Costs ("Pl.'s Suppl. Mot."), ECF No. 120.  Upon careful consideration of

the parties' submissions,[2] the Court concludes for the following reasons that it must: (1) grant in

---

[1] Amanda Bennett is the current Chief Executive Officer of the United States Agency for Global Media, and she is therefore substituted for Kenneth Weinstein, as the proper party defendant pursuant to Federal Rules of Civil Procedure 25(d).

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) Additional Exhibits for Motion for Equitable Relief ("Pl.'s Additional Exs."), ECF No. 109; (2) Additional Exhibits for Motion for Equitable Relief ("Pl.'s 2d Additional Exs."), ECF No. 110; (3) the Response and

(continued . . .)

part, deny in part, and hold in abeyance in part, the outstanding components of the Plaintiff's

Motion for Award of Equitable Relief; and (2) grant in part and deny in part the Plaintiff's First

Supplemental Motion for Award of Attorneys' Fees and Costs.

## I.    BACKGROUND

The Court outlined the factual background of this case in its earlier Memorandum

Opinion issued on October 4, 2018, see Alavi v. Weinstein, Civil Action No. 15-2146, 2018

WL 4828401, at *1 (D.D.C. Oct. 4, 2018) (Walton, J.), and, therefore, will not reiterate those

facts here.  The Court will, however, briefly discuss the procedural posture of this case following

the issuance of that earlier Memorandum Opinion.

On September 5, 2019, the jury trial in this case commenced, and, on September 16,

2019, the jury returned a partial verdict for the plaintiff.  See Verdict Form at 1, ECF No. 81.

Specifically, the jury found that the plaintiff did not prove her discrimination claim but did

establish her retaliation claim by a preponderance of the evidence.  See id.  The jury awarded the

plaintiff $175,000 in compensatory damages based on its finding that the plaintiff proved that

she was terminated from her employment as retaliation for participating in protected activity.

See id. at 1–2.  Thereafter, on February 25, 2020, the Court, at the parties' request, referred this

case to the Office of the Circuit Executive for mediation regarding the appropriate awards of

attorneys' fees, back pay, and any other relief requested by the plaintiff.  See Order at 1 (Feb. 25,

2020), ECF No. 104.  However, following the unsuccessful completion of the mediation period

---

(. . . continued)
Opposition to Plaintiff's Motion for Award of Equitable Relief ("Def.'s Opp'n"), ECF No. 112; (4) the Plaintiff's
Reply to Defendant's Response and Opposition to Award of Equitable Relief ("Pl.'s Reply"), ECF No. 113; (5) the
Defendant's Post-Hearing Submission ("Def.'s Suppl."), ECF No. 116; (6) the Plaintiff's Response to Defendant's
Post-Hearing Submission ("Pl.'s Suppl."), ECF No. 117; (7) the defendant's Response and Opposition to Plaintiff's
Supplemental Motion for Award of Attorneys' Fees and Costs ("Def.'s Suppl. Fees Opp'n"), ECF No. 121; and (8)
the Plaintiff's Reply to Defendant's Response and Opposition to Plaintiff's First Supplemental Motion for Award of
Attorneys' Fees and Costs ("Pl.'s Suppl. Fees Reply"), ECF No. 122.

on April 27, 2020, the parties requested, and the Court issued, a briefing schedule for the parties to address the plaintiff's entitlement to attorneys' fees, back pay, and any other relief.  See Order at 1 (Aug. 7, 2020), ECF No. 106.

On September 16, 2020, the plaintiff filed her motion for equitable relief, see generally Pl.'s Mot.; Pl.'s Mem, which the Court partially resolved in a January 2021 ruling from the bench, see Order at 1–2 (Jan. 7, 2021), ECF No. 114.  In her motion, the plaintiff requested "equitable relief to make her whole in accordance with the jury verdict[.]"  Pl.'s Mot. at 1. Specifically, the plaintiff sought monetary relief in the form of:

> [(1)] back pay from her April 2007 termination from the agency together with compound interest thereon (less her earnings by year) to the date of her reinstatement, which []is assumed to be March 1, 2021 for purposes of this motion; [(2)] an increment on back pay commensurate with the premium for weekend work characteristic of the work in the Persian [S]ervice where she worked; [(3)] bonus pay at a rate commensurate with [the] average annual rate of her contemporaries in the same grade, step[,] and job classification in [the] same office; [(4)] interest on the liquidated damages from September 19, 2019, the date of provisional judg[]ment, to the date of payment, March 16, 2020; and [(5) an] award of interim reasonable attorney[s]'[] fees for litigating this action and reasonable costs incurred in the action through August 31, 2020.

Id. at 1–2.  The plaintiff also sought non-monetary relief in the form of:

> [(1)] reinstatement in a suitable position which she would have reached, a GS[]-14[,] step 7 editor position; [(2)] transition training of up to four months to make up for the training she missed during the [thirteen] years she was out of the office and to refresh her technical skills; [(3)] reinstatement of all fringe benefits including annual leave, sick leave[,] and retirement accruals including matching contributions to retirement accounts; [(4)] reformation of her personnel file; and [(5)] a non-discrimination/[]retaliation order as to her and her witnesses.

Id. at 2.  On November 6, 2020, the defendant filed her response, which disputed (1) the GS and step level the plaintiff should be assigned upon reinstatement, see Def.'s Opp'n at 1–5; (2) the plaintiff's entitlement to back pay due to her purported failure to mitigate her damages, see id. at 5–10; (3) the plaintiff's entitlement to premium and bonus pay, see id. at 10; (4) the plaintiff's

entitlement to administrative litigation fees, see id. at 11; (5) the rate at which the plaintiff's attorneys' fees should be calculated, id. at 11–12; (6) the amount of attorneys' fees the plaintiff is entitled to receive considering her partial success at trial, see id. at 12; (7) the plaintiff's entitlement to an award of attorneys' fees for the services of "another senior lawyer at trial[,]" id. at 13; and (8) the propriety of the Court issuing a nondiscrimination, nonretaliation injunction, see id. at 13–14.  The defendant also proposed "that[] once the Court decides the issues of reinstatement and back pay, the parties work with the relevant government agencies . . . to determine the level of retirement and leave benefits that may be reinstated consistent with relevant federal regulations." Id. at 14.  The defendant did not dispute the plaintiff's other claims for equitable relief.  See generally id.  On November 25, 2020, the plaintiff filed her reply.  See generally Pl.'s Reply.

On December 21, 2020, the parties appeared before the Court for a hearing on the plaintiff's motion.  See generally Transcript of Telephonic Status Conference Before the Honorable Senior Judge Reggie B. Walton ("Tr."), ECF No. 115.  At the conclusion of the hearing, the Court granted in part, denied in part, and held in abeyance in part the plaintiff's motion.  See Order at 1 (Jan. 7, 2021).  Specifically, the Court granted the plaintiff's motion to the extent it sought:

> (1) [ ] to calculate weekend pay at the rate set forth in the plaintiff's motion, should the Court ultimately determine the plaintiff is entitled to weekend pay; (2) [ ] a finding that the plaintiff is entitled to bonus pay per year at a rate equal to the minimum amount received by her cohorts, should the Court ultimately determine the plaintiff is entitled to back pay; (3) [ ] a finding that the plaintiff is entitled to attorney[s]'[] fees and costs at a rate to be determined by the Court at a later date; and (4) [ ] a finding that the plaintiff is entitled to fringe benefits.

Id.  The Court denied the plaintiff's motion to the extent it sought:

> (1) [ ] bonus pay equal to the average rate of bonus pay received by the plaintiff's cohorts[,]  (2)  [ ]  a  nondiscrimination,  nonretaliation  injunction[,]  and  ([3])

challenge[d] the defendant's position that the parties will determine the
appropriate scope of fringe benefits in collaboration with the relevant government
agencies and in accordance with applicable regulations.[3]

Id. at 1–2. The Court held the other remaining issues raised by the parties in abeyance, pending

the parties' submission of supplemental briefing regarding:

(1) the plaintiff's representations regarding her purported entitlement to
reinstatement at the GS-13 level, (2) the defendant's representation regarding
administrative restrictions on the agency's ability to make a post[-]hoc
modification to the plaintiff's personnel file, and (3) the plaintiff's representations
regarding her cohorts that remained at the agency following her termination.

Id. at 2 (emphasis omitted).

Pursuant to the Court's instructions, on January 20, 2021, the defendant filed her

post-hearing submission, see generally the Defendant's Post-Hearing Submission ("Def.'s

Suppl."), ECF No. 116, and, on February 1, 2021, the plaintiff filed her response, see generally

the Plaintiff's Response to Defendant's Post-Hearing Submission ("Pl.'s Suppl."), ECF

No. 117.[4]

Subsequently, on January 19, 2024, the plaintiff filed her supplemental motion for

attorneys' fees and costs "for the period after August 31, 2020." See generally Pl.'s Suppl. Mot.

On February 2, 2024, the defendant filed her opposition to the plaintiff's supplemental motion

for fees and costs. See generally Response and Opposition to Plaintiff's Supplemental Motion

for Award of Attorneys' Fees and Costs ("Def.'s Suppl. Fees Opp'n"), ECF No. 121. And, on

February 9, 2024, the plaintiff filed her reply in support of her supplemental motion for fees and

---

[3] The Court further ordered the parties and "the relevant government agencies" to confer regarding "the amount of
fringe benefits the plaintiff is entitled to [receive.]" Order at 2 n.1 (Jan. 7, 2021). The Court also permitted the
plaintiff to "file a motion to the extent she may disagree with the resulting fringe benefit determination." Id. No
such motion has been filed as of the date of the issuance of this Memorandum Opinion.

[4] The Court regrets the lengthy delay in resolving the current motions. Mismanagement of the transfer of the case
from a departing to an incoming law clerk resulted in the issuance of this opinion being delayed, along with a
number of other cases that also required the issuance of memorandum opinions.

costs.  See generally Plaintiff's Reply to Defendant's Response and Opposition to Plaintiff's

First Supplemental Motion for Award of Attorneys' Fees and Costs ("Pl.'s Suppl. Fees Reply"),

ECF No. 122.

## II.    STANDARD OF REVIEW

"[O]ne of the central purposes of Title VII is 'to make persons whole for injuries suffered

on account of unlawful employment discrimination.'"  Franks v. Bowman Transp. Co., 424 U.S.

747, 763 (1976) (quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975)).  Pursuant

to Title VII:

> If the court finds that the [defendant] has intentionally engaged in . . . an unlawful
> employment practice charged in the complaint, the court may enjoin the
> [defendant] from engaging in such unlawful employment practice, and order such
> affirmative action as may be appropriate, which may include, but is not limited to,
> reinstatement or hiring of employees, with or without back pay . . . or any other
> equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g)(1).  Accordingly, the "[C]ourt[] must strive to grant 'the most complete

relief possible' in cases of Title VII violations."  Lander v. Lujan, 888 F.2d 153, 156 (D.C. Cir.

1989) (citing Franks, 424 U.S. at 764).  The Court's objective must be to "restore the prevailing

plaintiff[], as nearly as possible, to the circumstances [she] 'would have occupied if the wrong

had not been committed.'"  Robinson v. District of Columbia, 341 F. Supp. 3d 97, 105 (D.D.C.

2018) (quoting Lander, 888 F.2d at 156).  In this regard, the Court has "considerable

discretion[.]"  Lander, 888 F.2d at 156.

## III.    ANALYSIS

Based on the Court's prior rulings and the parties' most recent submissions, the Court has

identified the following issues that require resolution: (1) the level of the position at which the

plaintiff must be reinstated, (2) the plaintiff's entitlement to back pay, (3) the plaintiff's

entitlement to a post-hoc modification to her personnel file, and (4) the scope and rate applicable

to the plaintiff's entitlement to an award of attorneys' fees.  The Court will address each of these issues in turn.

## A.    Reinstatement

In her motion for post-verdict relief, the plaintiff argued that she is entitled to reinstatement as "a GS[-]14[,] step 7 editor [ ] at the Persian Service, U.S. Agency for Global Media[.]"  Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Award of Equitable Relief ("Pl.'s Mem.")) at 9, ECF No. 108-1.  The defendant responded that the plaintiff should instead be reinstated "at a level of GS-12, step 8."  Def.'s Opp'n at 2.  According to the defendant, the plaintiff's "position was capped at GS[-]12 and did not allow for a higher GS level[,]" and thus reinstating her at a higher level would constitute an inappropriate "promotion[.]"  Id.  In reply, the plaintiff asserted that the defendant's argument "ignores law and the evidence and would fall short of genuine make-whole relief."  Pl.'s Reply at 2.

During the December 21, 2020 hearing, the Court concluded that the plaintiff is "clearly [ ] entitled to be reinstated at the GS-12, step 8 level[, with eligibility] . . . at GS-12, step 9 on March 1[, 2021]."  Tr. at 21:17–19.  However, the plaintiff asserted during the hearing that "[a]ll the individuals who were there in 2007 when [the plaintiff] was there in the same grade, same step, same job series[—]all [of] those individuals were promoted to [GS-]13[.]"  Id. at 5:21–24; see also id. at 15:19–16:5 (highlighting the four "entry level Grade 12, step one employees in 2007 that . . . all became Grade 13s").  Because "there [wa]s a factual dispute" between the parties regarding the alleged promotion of the plaintiff's former colleagues to the GS-13 level, id. at 21:24–22:3, the Court provided the defendant with "the opportunity to present something . . . that refutes" the plaintiff's assertion regarding the alleged GS-13 promotions, id. at 22:7–12.  In response, the defendant asserts that "only three of the four [former colleagues at

issue] were promoted to GS-13[,]" and it would therefore be "speculative" to assume that the plaintiff would have been similarly promoted.  Def.'s Suppl. at 2.  The plaintiff contends, however, that the individual referenced by the defendant who was not promoted to GS-13 level status by the agency actually "left the agency in 2014 for a promotion at another agency[,]" Pl.'s Suppl. at 1, and "there is no reason to treat the departure of [that individual] as a failure to promote[,]" id. at 2.

"In Title VII cases, reinstatement is generally the 'preferred remedy.'"  Banks v. Perdue, 298 F. Supp. 3d 94, 113 (D.D.C. 2018) (quoting Webb v. District of Columbia, 146 F.3d 964, 976 (D.C. Cir. 1998)).  However, "[b]ecause 'a successful Title VII plaintiff is entitled only to appropriate equitable relief,' the [C]ourt must 'careful[ly] consider[ ] . . . the circumstances of [each] particular case' to determine whether reinstatement is appropriate[.]"  Id. (quoting Webb, 146 F.3d at 976) (third, fourth, and fifth alterations in original) (emphasis omitted) (internal citations omitted).  The Court's assessment must be "guided by sound legal principles[,]" Albemarle Paper Co., 422 U.S. at 416 (internal quotation marks omitted), and "measured against the purposes which inform Title VII[,]" id. at 417, including to "make persons whole for injuries suffered on account of unlawful discrimination[,]" id. at 418.  In some instances, "courts have used the career paths of comparator employees in order to calculate awards of equitable relief[.]"  Lloyd v. Holder, No. 97-1287 (PLF), 2010 WL 1999657, at *3 (D.D.C. May 18, 2010).  However, courts have not ordered reinstatement at a higher position than the one that the employee held prior to a termination where the plaintiff's promotion arguments are "unduly speculative."  Jean-Baptiste v. District of Columbia, 958 F. Supp. 2d 37, 42 (D.D.C. 2013).

The Court agrees with the plaintiff that, in light of the information provided regarding her former colleagues who were promoted from GS-12 to GS-13, see Pl.'s Suppl. at 1–2, it would be

appropriate to reinstate her at the GS-13 level.  "Courts in this District occasionally grant

retroactive promotions grounded in plaintiffs' 'career path' theories, applying the principle that a

'remedial decree which considers career progress improperly denied is well within this Court's

discretion under Title VII.'"  Craig v. Mnuchin, No. 14-1340 (RC), 2018 WL 6079512, at *5

(D.D.C. Nov. 21, 2018) (quoting Brown v. Marsh, 713 F. Supp. 20, 22 (D.D.C. 1989)).  In

considering a retroactive promotion, the Court must examine "the career path of the [employees]

promoted in the plaintiff's stead[,]" Brown 713 F. Supp. at 22, "and any record evidence

suggesting that the plaintiff was likely to progress at a similar or faster rate[,]" Craig, 2018 WL

6079512, at *5.  Here, the plaintiff is correct that reinstatement at the GS-13 level would mirror

"the career paths of comparator employees[,]" Lloyd, 2010 WL 1999657, at *3, without

amounting to "undu[e] speculati[on,]" Jean-Baptiste, 958 F. Supp. 2d at 42.  The defendant has

confirmed that three of the plaintiff's four colleagues "in the Persian Service who were at GS-12,

step 1, at the same time as [the plaintiff] in 2006[–]07 were eventually promoted to GS-13 level

positions."  Def.'s Suppl. at 1.  And, while the defendant acknowledges that the fourth colleague

"was a GS-12, step 7[,] when he left [the agency,]" Def.'s Suppl. at 2, the defendant neglects to

note that the fourth colleague—after leaving the agency in 2014—joined another agency "where

he was a GS[-]13 on January 1, 2015."  Pl.'s Suppl. at 1 n.1 (citing id., Exhibit ("Ex.") 1 (Federal

Employee Salaries) at 1–2).

Moreover, although the plaintiff acknowledges that "the advancements to GS[-]13 of the

comparators were somewhat longer than the progression [the p]laintiff anticipates," Pl.'s Reply

at 4; see also Pl.'s Suppl. at 1 n.1 (listing the amount of time the comparator employees in

Grade 12 before being promoted to Grade 13), the record evidence demonstrates that the plaintiff

was on the path toward promotion to an executive producer position at the GS-13 level after the

"anticipated launch of the History Channel show in the [s]ummer of 2007[,]" Pl.'s Mem. at 11, which she estimates would have occurred by "January 1, 2008[,]" id.; see Pl.'s Mot., Ex. (Declaration of Banafshé Alavi ("Alavi Decl.")) ¶ 6, ECF No. 108-3 (describing a meeting with the Persian Service Chief and a group of Executive Producers on March 1, 2007, regarding "[the plaintiff's] transfer detail to a new program launch, called the 'History Channel[,]' [which] was described as the opportunity for [her] to work with Scot Riddlesberger on a high priority new launch at a different level of responsibility with [her] next move to become an Executive Producer at a GS[-]13 level"); id. (describing the "Executive Producer functions" she was performing with the guidance of Mr. Riddlesberger while working on the History Channel); Pl.'s Mot., Ex. 2 (Day 3 P.M. Session Transcript of Jury Trial Before the Honorable Reggie B. Walton ("Day 3 Trial Tr.")) at 57:7–8, ECF No. 108-4 (testimony of Mr. Riddlesberger describing the plaintiff's work on the History Channel Project as "exemplary"). This evidence supports the plaintiff's position that she "was likely to progress at a . . . faster rate" than the comparator employees. Craig, 2018 WL 6079512, at *5. Thus, based on the evidence that every other GS-12, step 1 employee in the same job series as the plaintiff was eventually promoted to GS-13 status and the evidence of the plaintiff's progression toward an executive producer position on the History Channel in the month prior to her termination, the Court concludes that it is not unduly speculative to conclude that the plaintiff would have been promoted to the GS-13 level. Compare Brown, 713 F. Supp. at 22 (concluding that "compensation pursuant to [the plaintiff's] 'career path' theory [wa]s required to make him 'whole'" after being refused a position for discriminatory reasons where the record suggested that the plaintiff was "an exceptional" employee and placing him only in the position he was initially refused "seem[ed] clearly inequitable"), with Lloyd, 2010 WL 1999657, at *3 (refusing to grant a retroactive promotion

where the record indicated that the plaintiff "was an average employee[,]" and the career path of

the individual that the plaintiff sought to imitate "was not comparable" to that of the plaintiff,

rendering it "at best uncertain whether [the] plaintiff would have been selected for a competitive

[ ] position [at the level sought], even with the benefit of the various assignments he was

denied").

By contrast, the Court finds that it would be "unduly speculative[,]" Jean-Baptiste, 958 F.

Supp. 2d at 42, to conclude that reinstatement at the GS-14 level would mirror "the career paths

of [the plaintiff's] comparator employees[,]" Lloyd, 2010 WL 1999657, at *3. "[C]ourts have

been reluctant to grant retroactive promotions where a plaintiff is unable to sufficiently

demonstrate that he [or she] would have achieved the promotions sought, but for the

discrimination or retaliation." Craig, 2018 WL 6079512, at *5. Although one of the plaintiff's

comparator employees, Popal Rangbar, "was hired as a GS[-]12[,] step 1 in November 2005 and

promoted to GS[-]13[,] step 2 in June 2010 after about five years in grade and to GS[-]14 in

2012 after about two years at GS[-]13[,]" Pl.'s Mem. at 13, the other three comparator

employees—Kaveh Adib, Saman T. Arbabi, and Robert B. Bordbar—did not advance to the

GS-14 level, see Pl.'s Suppl. at 1 n.1. Furthermore, although the plaintiff asserts that her

"knowledge, skills and abilities of V[oice] [of] A[merica], the technical processes of TV

production, Farsi language, Persian culture and journalism were far superior to those of Mr.

Rangbar[,]" Pl.'s Mot., Ex. (Alavi Decl.) ¶ 14, it is uncertain whether the plaintiff would have

been promoted to the GS-14 level approximately two years after being in a GS-13 level position

rather than remaining at the GS-13 level with the other comparator employees. "[W]hile the

Court may engage in some speculation in granting equitable relief, [the plaintiff's] assertion that

[s]he would have received [a promotion to level GS-14] but for [the agency's] retaliation is

overly speculative[,]" Craig, 2018 WL 6079512, at *6 (internal quotation marks omitted); see

Fogg v. Gonzales, 407 F. Supp. 2d 79, 91 n.6 (D.D.C. 2005) (concluding that the plaintiff was

not entitled to a retroactive promotion where such a promotion was "overly speculative" and "the

court [wa]s not persuaded that he would have been among the relatively few [individuals]

selected to advance to the . . .  level" sought), aff'd in part and rev'd in part on other grounds,

492 F.3d 447 (D.C. Cir. 2007).

Therefore, because the defendant failed to refute the plaintiff's claims regarding the

promotions of the plaintiff's colleagues to the GS-13 level, the Court concludes "that the

reinstatement [of the plaintiff] at the GS-13 level would be appropriate."  Tr. at 22:15–16.

**B.**     **Back Pay**

The plaintiff also argued in her motion that she is entitled to:

> [(1)] back pay from her April 2007 termination from the agency together with
> compound interest thereon (less her earnings by year) to the date of her
> reinstatement . . . ; [(2)] an increment on back pay commensurate with the
> premium for weekend work characteristic of the work in the Persian [S]ervice
> where she worked; [and (3)] bonus pay at a rate commensurate with [the] average
> annual rate of her contemporaries in the same grade, step[,] and job classification
> in [the] same office[.]

Pl.'s Mot. at 1.

In opposition, the defendant asserted that the plaintiff was either entitled to no back pay

because she failed to mitigate her damages, see Def.'s Opp'n at 5–8, or, "[a]lternatively, back

pay should be offset by reasonable mitigation earnings[,]" id. at 8.  Furthermore, the defendant

argued that determining the amount of premium and bonus pay would be "speculative" even

though the defendant's expert "accepts [the plaintiff's expert's] premium pay percentage of total

compensation and uses this in her calculations" for simplicity.  Id. at 10; see also id., Ex. 2

(Report of Dr. Laura A. Malowane ("Malowane Rpt.")) ¶ 12, ECF No. 112-2.

During the December 21, 2020 hearing, the Court concluded that, if the plaintiff is entitled to a back pay award, she would be entitled to back pay "consistent with [her] position in reference to the rate of pay she would have been entitled to[,] including the premium weekend pay." Tr. at 27:25–28:3.  Furthermore, the Court concluded that, if the plaintiff is entitled to a back pay award, she would also be entitled to bonus pay at "the minim[um] amount that any of [her colleagues] received by way of bonuses[.]"  Id. at 31:5–6.  However, the Court deferred ruling on these matters, pending an additional review of the record, a ruling on "whether there was adequate mitigation[ by the plaintiff, a]nd, if there was, what amount of damages the plaintiff would be entitled to recover."  Id. at 52:18–21.

The Court has "wide discretion" in awarding back pay to make a prevailing Title VII plaintiff whole.  Peyton v. DiMario, 287 F.3d 1121, 1126 (D.C. Cir. 2002) (internal quotation marks omitted); see also 42 U.S.C. § 2000e-5(g)(1) ("If the court finds that the [defendant] has intentionally engaged in . . . an unlawful employment practice charged in the complaint, the court may . . . order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer[ or] employment agency . . . responsible for the unlawful employment practice)[.]").  Generally, "[b]ack pay is the difference between the actual wages earned and the wages the individual would have earned in the position that, but for the discrimination, the individual would have attained."  Robinson v. District of Columbia, No. 15-444 (RC), 2019 WL 2028397, at *9 (D.D.C. May 8, 2019) (internal quotation marks omitted).  For a court to award back pay, "the plaintiff bears the initial burden of establishing the value of the lost salary and benefits[.]"  Barbour v. Merrill, 48 F.3d 1270, 1278 (D.C. Cir. 1995).  However, "calculating lost pay in a case like this necessarily involves some amount of estimation, precisely because it is not possible

to reconstruct with perfect accuracy the events that would have occurred but for the defendant's unlawful conduct[.]"  Caudle v. District of Columbia, 825 F. Supp. 2d 73, 78 (D.D.C. 2011); see also Pittington v. Great Smoky Mountain Lumberjack Feud, LLC, 880 F.3d 791, 799 (6th Cir. 2018) ("Back[ ]pay should be awarded even where the precise amount of the award cannot be determined." (internal quotation marks omitted) (quoting Rasimas v. Mich. Dep't of Mental Health, 714 F.2d 614, 628 (6th Cir. 1983))); Akouri v. Fla. Dep't of Transp., 408 F.3d 1338, 1343 (11th Cir. 2005) ("'[U]nrealistic exactitude is not required' as the back[ ]pay calculation may be based on 'just and reasonable inference' of the missing or imprecise figure." (alteration in original) (quoting Pettway v. Am. Cast Iron Pipe Co., 494 F.2d 211, 260 (5th Cir. 1974))); cf. Barbour, 48 F.3d at 1280 ("[A] district court should not refuse to award front pay merely because some speculation about future earnings is necessary.").

Furthermore, the plaintiff has a "statutory duty to minimize damages[,]" Ford Motor Co. v. Equal Emp. Opportunity Comm'n, 458 U.S. 219, 231 (1982), by exercising "reasonable diligence" to secure other suitable employment, Berger v. Iron Workers Reinforced Rodmen, Loc. 201, 170 F.3d 1111, 1133 (D.C. Cir. 1999) (quoting 42 U.S.C. § 2000e-5(g)).  "[T]he 'burden of establishing facts in mitigation of the back pay liability is . . . upon the violator[.]'" Fogg v. Gonzales, 492 F.3d 447, 455 (D.C. Cir. 2007) (quoting Berger, 170 F.3d at 1134). "Generally, employers carry their burden by establishing that (1) the claimant did not make reasonably diligent efforts to find other suitable employment and (2) other suitable employment was, in fact, available."  Coulibaly v. Pompeo, No. 14-cv-712 (RC), 2020 WL 1536185, at *7 (D.D.C. Mar. 31, 2020).

1.  **Whether the Plaintiff Failed to Make Reasonably Diligent Efforts to Find Other Suitable Employment**

The Court first considers whether the defendant has established that the plaintiff failed to make reasonably diligent efforts to find other suitable employment.  The plaintiff claims that she "maintained a purposeful and consistent effort to find new work in the [television] field starting immediately after her termination: garnering recommendations, constant job searches online, networking, starting an independent video business, and attending conferences."  Pl.'s Mem. at 13.  But, as the defendant correctly indicates, "[i]n the years following her termination, the record establishes that [the p]laintiff failed, with one exception, to . . . [actually] obtain similar work."  Def.'s Opp'n at 5.  The one exception was "a temporary contract job at Fox News in an entry level teleprompter position at an hourly rate of about $15 per hour."  Pl.'s Mem. at 14; see also Def.'s Opp'n at 5.  The defendant contends that "[o]ther than the Fox Television position that [the p]laintiff [admitted to quitting after two months], there is no record evidence that [the p]laintiff sought any suitable employment, as in actually appl[ying] for similar jobs, in the years immediately following her termination."  Def.'s Opp'n at 6 (emphasis in original).  However, the plaintiff's declaration does show that she made some efforts to secure comparable employment. See, e.g., Pl.'s Mot., Ex. (Alavi Decl.) ¶ 15 (alleging that "[a]fter [she] was terminated in April 2007, [she] did everything [she] reasonably could to find another job in TV or [a] related field [through] constant job searches online, networking, starting an independent video business, and attending conferences"); id. ¶ 16 (stating that "[t]o further [her] job search[,] [she] sought and obtained positive personal recommendations from four former colleagues and friends immediately after [her] termination"); id. ¶¶ 17–18 (describing job search efforts such as "solicit[ing] colleagues for recommendations as to TV job web sites and possible employers for TV production and media jobs[,]" "routinely search[ing] through the primary online job search

engines[,]" and "follow[ing] up with applications for any TV production jobs and production

related jobs posted"); id. ¶¶ 23, 24 (describing the "temporary contract job at Fox News" she

"took" in 2007 but "decided to leave" after "about eight weeks[,]" as well as the "independent

video/TV production business" she "worked to build up . . . from 2010 until 2015"); id. ¶ 20

(describing her application to "TV production positions at [Voice of America] including the

Persian Service . . . in July 2019 and . . . December 2018").

      Despite the plaintiff's representations, the defendant has demonstrated that the plaintiff

did not consistently exercise "reasonable diligence[,]" Berger, 170 F.3d at 1133 (internal

quotation marks omitted), to secure suitable employment.  While the plaintiff accepted the

temporary job at Fox News in 2007 after her termination, she earned no income in 2008 and

2009—justifying the lack of employment only with the explanation that "2008 and 2009 were

the economic meltdown years and there were no jobs[.]"  Pl.'s Mot., Ex. (Alavi Decl.) ¶ 26.

Between 2010 and 2015, the plaintiff attempted to establish her own "independent video/TV

production business[,]" id. ¶ 24, and "provid[ed] adult care assistance . . . through a home care

agency[,]" id. ¶ 25.  However, neither of these jobs were substantially equivalent to her former

position.  See Griffin v. Wash. Convention Ctr., No. 93-2297 (JMF), 2000 WL 1174967, at *2

(D.D.C. July 21, 2000) (stating that "the presumption in favor of back pay can be overcome only

by the defendant showing that there was substantially equivalent employment available and that

the plaintiff failed to search for it in a meaningful way and accept it once found"); Lewis v.

District of Columbia, 791 F. Supp. 2d 136, 143 (D.D.C. 2011) (defining "'[s]ubstantially

equivalent' employment [as] that which affords 'virtually identical promotional opportunities,

job responsibilities, and status as the position from which the Title VII claimant has been

discriminatorily terminated'" (quoting Donlin v. Philips Lighting N.A. Corp., 581 F.3d 73, 84

(3d Cir. 2009)).  Moreover, the plaintiff's declaration shows minimal job search efforts between 2016 and 2019.  See id. ¶ 21 (describing the "one-day [p]roduction event" for which CPR MultiMedia Solutions hired the plaintiff in March 2016); id. ¶ 20 (describing two applications to "TV production positions at [Voice of America,] including the Persian Service" submitted by the plaintiff in July 2019 and December 2018" which were denied on grounds that she "lacked the minimum qualifications for the position").

Based on this record, the Court cannot conclude that the plaintiff consistently made reasonable efforts to secure suitable employment from 2008 to 2017,[5] let alone do "everything reasonably possible to find a job in the [television] production field right from the month she was terminated[,]" as she claims.  Pl.'s Mem at 16.  To demonstrate that she was engaged in a "constant job search[,]" the plaintiff references "documentation of application acknowledgments from all major Washington [television] employers[.]"  Pl.'s Reply at 7; see Pl.'s Mot., Ex. 7 (Application Confirmations) at 29–31, 33–36, ECF No. 108-4 (compilation of email acknowledgements regarding approximately eleven applications the plaintiff submitted to television employers); id., Ex. 8 (Email from Jeffrey Beyer to Bany Alavi (July 16, 2018) (Indeed Inquiry)) at 38–39, ECF No. 108-4 (email from the Chief Operating Officer of Technologist Inc. in response to the plaintiff's inquiry regarding a job posting on Indeed).  However, as the plaintiff concedes, see Pl.'s Reply at 7, the majority of the application acknowledgements are undated, see Pl.'s Mot., Ex. 7 (Application Confirmations) at 29–31, 34.  Thus, because it is unclear when the plaintiff submitted these applications, this documentation does not refute the defendant's position that the plaintiff did not consistently make reasonable

---

[5] The defendant appears to acknowledge that the plaintiff at least sought suitable employment between 2018 and 2019.  See Def.'s Opp'n at 6 (stating that "[w]ith one exception, [ ] there is no evidence of [the p]laintiff seeking employment in the [television] production and media fields until 2018[–]2019, which was more than ten years after her termination").

efforts to secure suitable employment.  Moreover, the only dated application confirmations

pertain to three job applications that were submitted in 2018 and 2019, more than ten years after

her termination.  See id., Ex. 7 (Application Confirmations) at 33, 35–36.  Accordingly, based on

the minimal efforts taken by the plaintiff to secure suitable employment during the years after

her termination, the Court concludes that the defendant has shown that the plaintiff did not

consistently exercise "reasonable diligence[,]" Berger, 170 F.3d at 1133 (internal quotation

marks omitted), to secure suitable employment, and therefore "failed to take reasonable steps to

mitigate" her damages during the time for which she seeks back pay.  Hopkins v. Price

Waterhouse, 737 F. Supp. 1202, 1215 (D.D.C. 1990), aff'd, 920 F.2d 967 (D.C. Cir. 1990).

### 2.    Whether Other Suitable Employment Was Available to the Plaintiff

Next, the Court considers whether there was other suitable employment available to the

plaintiff.  The defendant has produced no information that indicates whether "other suitable

employment was, in fact, available[ to the plaintiff during the time for which she seeks back

pay.]"  Coulibaly, 2020 WL 156185, at *7.  Instead, the defendant argues that "[t]he prevailing

view is that the employer 'is released from the duty to establish the availability of comparable

employment' if a plaintiff failed to pursue employment."  Def.'s Opp'n at 7 (quoting Greenway

v. Buffalo Hilton Hotel, 143 F.3d 47, 54 (2d Cir. 1998)).  In response, the plaintiff asserts that

the District of Columbia Circuit has not adopted the defendant's position and, although another

member of this Court in Conn v. American National Red Cross, 149 F. Supp. 3d 136 (D.D.C.

2016) "entertain[ed] a similar principle in a summary judgment ruling that deferred on the matter

of job search efforts owing to presence of material factual disputes," this statement was merely

dicta.  Pl.'s Reply at 8 n.4.

"[S]ome circuits have held that if a defendant can prove that a plaintiff did not make a

reasonable or good faith effort to seek employment, then the defendant is relieved of that burden

of establishing that suitable alternative employment opportunities existed." <u>Colibaly</u>, 2020 WL

1536185, at *7 n.4 (citing <u>Greenway</u>, 143 F.3d at 54). "And the D.C. Circuit seems to have

endorsed this exception[,]" <u>id.</u>, to the standard rule that the defendant must prove the availability

of suitable employment. <u>See</u> <u>Nat'l Lab. Rels. Bd. v. Madison Courier</u>, 472 F.2d 1307, 1319

(D.C. Cir. 1972) (explaining that where a plaintiff has failed to diligently exercise good faith

efforts to find new employment, "a scarcity of work and the possibility that none would have

been found even with the use of diligence [are] irrelevant" to the question of whether "back pay

liability may properly be reduced"); <u>see also</u> <u>Conn</u>, 149 F. Supp. 3d at 152 (stating that the

standard from <u>Madison Courier</u> "conforms to the prevailing view among the circuits" and

concluding that "if the [defendant] can establish that [the plaintiff] did not conduct a good-faith

job search, it need not also present evidence on the availability of suitable alternative

employment in order to successfully advance its affirmative defense that [the plaintiff] failed to

mitigate damages"). <u>But see</u> <u>Sebunya v. Mayorkas</u>, No. 21-cv-780 (CRC), 2024 WL 1076809,

at *20 (D.D.C. Mar. 8, 2024) (assessing back pay under both factors after noting that "[i]n

<u>Madison Courier</u>, . . . the D.C. Circuit examined § 10(c) of the National Labor Relations Act[,]

[b]ut the Supreme Court has counseled that § 10(c), which was passed 'prior to enactment of the

Civil Rights Act of 1964,' 'gives [ ] guidance as to the proper meaning of the same language in

§ 706(g) [42 U.S.C. § 2000e-5(g)] of Title VII.'" (quoting <u>Pollard v. E.I. du Pont de Nemours &</u>

<u>Co.</u>, 532 U.S. 843, 849 (2001)).

Although, as the court in <u>Conn</u> found, the District of Columbia Circuit's decision in

<u>Madison Courier</u> appears to support the defendant's argument that it does not have to

demonstrate the availability of suitable employment to establish its affirmative defense, the

Circuit has not conclusively ruled that such proof is not required, especially after the passage of

the Civil Rights Act.  Therefore, in the absence of such an express directive by the Circuit or the Supreme Court, the Court must conclude that the defendant has failed to establish that "other suitable employment was, in fact, available[,]" Coulibaly, 2020 WL 156185, at *7, and has therefore failed to carry its "burden of proving failure to mitigate[,]" DiMario, 287 F.3d at 1128.

### 3.  Back Pay Calculation

Having found that the defendant failed to establish its affirmative defense that the plaintiff failed to mitigate her post-employment damages, the Court now turns to the proper calculation for the back pay award the plaintiff is entitled to receive.  The defendant argues that a back pay award "should be offset by reasonable mitigation earnings," Def.'s Opp'n at 8, and has presented its economist's method of assessing the plaintiff's back pay entitlement in light of the efforts that she made to secure employment, see generally id., Ex. 2 (Malowane Rpt.). Specifically, the defendant's economist "has taken [the p]laintiff's Fox [News teleprompter operator] earnings and assumed that she would have earned the same [amount] over the course of five years, at which point [the defendant's economist] assumes that [the p]laintiff would have attained a job with equivalent earnings." Id. at 9.  Additionally, the defendant also argues that any back pay award should be offset by "the possibility of no employment." Id. at 9–10.  The plaintiff takes issue with the defendant's offset approach because (1) it "convert[s an] entry level minimum wage [job] at Fox into a permanent position to launch a new career" and (2) it assumes it would take a mere five years to reach pay parity from the minimum wage job she had at Fox. Pl.'s Reply at 9.  The plaintiff contests the offset for the possibility of no employment as "arbitrary" because, other than mere "speculation[,]" no facts in the record support this possibility. Id. at 13.  While the plaintiff implores the Court to discard the defendant's economist's approach, see id. at 9 (arguing that the "defendant's economist['s r]eport departs from the facts, law[,] and logic" (capitalization omitted)), she has failed to provide a contrary

model or approach for the Court to consider in determining what the offset backpay award should be.

Upon consideration of the parties' filings, and because the Court has concluded that (1) the plaintiff is entitled to reinstatement at the GS-13 level, rather than the level requested by either the plaintiff or the defendant; and (2) the defendant has not met her burden of establishing the plaintiff's failure to mitigate, the Court concludes that, based on the current record, it does not have sufficient information to independently calculate the back pay award the plaintiff is entitled to receive. Therefore, the Court will hold in abeyance this component of the plaintiff's motion, pending supplemental briefing from both parties on the back pay award, consistent with the Court's conclusions in this Memorandum Opinion.[6]

## C.    Personnel File Modification

The plaintiff argued that the Court should require the defendant to:

> remove from her official personnel record all records that support, evidence[,] or refer to the termination of [the plaintiff] or its rationale; replace all performance related records to show exemplary performance from 2007 to 2008[,] []pursuant to [the] testimony of Scot Riddlesberger[] with successful satisfaction of her probationary period; satisfactory performance for all successive evaluation periods until reinstatement; and permit [the plaintiff] and[]/or her counsel to inspect her [Official Personnel Folder] to confirm the accomplishment of those activities.

Pl.'s Mem. at 22. During the December 21, 2020 hearing, the Court declined to grant this level of relief requested by the plaintiff, see Tr. 78:6–8 (declining to require the defendant to add performance evaluations to the plaintiff's personnel file because there was no "legal determination that was made in a proceeding before [the Court] that would provide a predicate

---

[6] Consistent with the Court's earlier ruling, the parties' proposed reduced back pay awards must account for the Court's prior determination that (1) weekend pay must be calculated "at the rate set forth in the plaintiff's motion[;]" and (2) the plaintiff "is entitled to bonus pay per year at a rate equal to the minimum amount received by her cohorts[.]" Order at 1 (Jan. 7, 2021).

for [the Court] to order that type of relief"), but indicated that it would be inclined to order the

removal of "any reference to the termination[,]" id. at 78:11, i.e., "the relief consistent with the

ruling made by the jury," id. at 78:9–10.  However, because the defendant indicated a "concern

about" whether "Executive Order 13839" would prohibit such a modification of a personnel file,

Tr. at 76:4–5, the Court permitted the defendant to indicate "the agency's position" on the issue

in supplemental briefing, id. at 76:20.

In her supplemental submission, the defendant "call[ed] the Court's attention to" Section

5 of Executive Order 13839, Def.'s Suppl. at 3, which states:

> Agencies shall not agree to erase, remove, alter, or withhold from another agency
> any information about a civilian employee's performance or conduct in that
> employee's official personnel records, including an employee's Official Personnel
> Folder and Employee Performance File, as part of, or as a condition to, resolving
> a formal or informal complaint by the employee or settling an administrative
> challenge to an adverse personnel action[,]

Exec. Order 13839, Promoting Accountability and Streamlining Removal Procedures Consistent

with Merit System Principles, 83 Fed. Reg. 25343 § 5 (May 25, 2018).  However, the defendant

concedes in her post-hearing submission that she is "unaware of any legal authority interpreting

this Executive Order as limiting the scope of the equitable relief that may be ordered by a federal

court."  Def.'s Suppl. at 4.  Furthermore, as the plaintiff indicates, see Pl.'s Suppl. at 5, Executive

Order 13839 has been revoked by Executive Order 14003, see Exec. Order 14003, Protecting the

Federal Workforce, 86 Fed. Reg. 7231 § 3(c) (Jan. 27, 2021) ("Executive Order 13839 of May

25, 2018 (Promoting Accountability and Streamlining Removal Procedures Consistent with

Merit System Principles), is hereby revoked.").  Accordingly, because the "[C]ourt[] must strive

to grant 'the most complete relief possible' in cases of Title VII violations[,]" Lander, 888 F.2d

at 156 (quoting Franks, 424 U.S. at 764)), the Court directs the defendant to "[r]eform and

correct [the] plaintiff's official personnel folder ('OPF') and all personnel records of the agency

to void the April 2007 termination of [the] plaintiff now determined to have been illegal[,]" Pl.'s

Reply, Ex. 2 (Revised Proposed Order), ECF No. 113-2, and to remove "all records that support,

evidence[,] or refer to the termination of [the plaintiff] or its rationale[,]" Pl.'s Mem. at 22.  To

ensure that the relief has been properly implemented, the defendant shall submit to the plaintiff

an updated version of the plaintiff's Official Personnel Folder within thirty days of the issuance

of this Memorandum Opinion.  See Craig, 2018 WL 6079512, at *10 (imposing a requirement

identical to that which the Court orders in this case to ensure compliance with the personnel

record-related relief ordered by the court).

### D.    Attorneys' Fees and Costs

The plaintiff's motion for post-verdict relief also sought "an award of interim reasonable

attorneys' fees for litigating this action and reasonable costs incurred in the action through

August 31, 2020[,]" Pl.'s Mot. at 2, and the plaintiff's supplemental motion "seeks fees and costs

for the period after August 31, 2020," Pl.'s Suppl. Mot. at 1.[7]

Title VII provides that prevailing parties may recover a "reasonable attorney's fee . . . as

part of the costs[.]"  42 U.S.C. § 2000e–5(k).  According to the plaintiff, she is entitled to

attorneys' fees in accordance with the "[d]ocumented and [r]easonable" hours worked by her

attorneys, Pl.'s Mem. at 18, "[p]ayable at [c]urrent [r]ates" due to the delay in the resolution of

this case,[8] with interim costs included, see id. at 20.  Generally, the "[d]efendant does not oppose

---

[7] Upon consideration of the plaintiff's submissions, which include receipts documenting the costs incurred in this litigation, the Court concludes that the plaintiff's requested costs of (1) $26,482.12 through August 21, 2020; and (2) $264.20 after August 21, 2020, are reasonable and an award in that amount will be granted.

[8] The plaintiff's claims were initially litigated before the Equal Employment Opportunity Commission (EEOC) in 2007 and 2008, see Pl.'s Mem. at 20, and the plaintiff represents that "[s]ome 174 uncompensated hours relating to the termination claims have been outstanding for [thirteen] years since the 2007 and 2008 EEOC discovery and hearings[,]" id.  The plaintiff also argues that "[t]he additional five years from the case filing to the time when this Court will be ready to rule on the relief matters itself warrants compensation at current rates."  Id.

the award of reasonable attorneys' fees." Def.'s Opp'n at 11. However, the defendant contests

the plaintiff's purported entitlement to (1) administrative litigation fees, (2) fees calculated at

current rates, and (3) fees without deduction due to her partial success.[9] See id. at 10–12. The

Court will address each of the defendant's objections in turn.

### 1. Whether the Plaintiff's Requested Billing Rates and Number of Hours Billed Are Reasonable

The plaintiff seeks an award of $862,832.98 in interim attorneys' fees based on a total of

1,371.81 hours at the highest LSI Laffey Matrix rate at the time the plaintiff filed her motion and

$26,482.12 in reasonable costs incurred in the action through August 31, 2020. See Pl.'s Mot. at

19–20. In her supplemental motion, the plaintiff also seeks "payment of $93,410.25 in fees for

115.75 hours at the highest Fitzpatrick Matrix rate of $807 per hour and costs of $264.20[]" for

the period after August 31, 2020, "covering the hours drafting and submitting [the p]laintiff's

reply to [the d]efendant's [o]pposition to [the] Plaintiff's Motion for Award of Equitable Relief,

preparation for the December 2020 hearing on the motion, and the post-hearing submissions in

early 2021." Pl.'s Suppl. Mot. at 1. The defendant does not object to the reasonableness of Mr.

Shea's billing rates and number of hours billed, but instead argues that Mr. Shea "did not require

a second attorney with [over] 31[] years of experience to assist at trial[,]" nor did he "need

another senior lawyer to assist with a fees motion and the subsequent hearing and filing." Def.'s

Suppl. Fees Opp'n at 4; see Def.'s Opp'n at 13 (noting that while it did not believe Mr. Patton's

services were necessary, it "[would] not challenge the requested fee amount" for his services).

---

[9] The defendant also raises a concern regarding the presence of another senior attorney at trial, asserting that "[f]ees [ ] sought for the time of Robert J. Patton, Jr." are unwarranted because the plaintiff's other counsel, Timothy Shea, "did not require an attorney with [over] 31[] years of experience to assist at trial." Def.'s Opp'n at 13. The Court will discuss this objection below, see infra section III.D.1.

Under Title VII, the Court may—in its discretion—award reasonable attorneys' fees to a "prevailing party[.]"  42 U.S.C. § 2000e-5(k).  "[A] 'prevailing party' is one who has been awarded some relief by the court . . . ."  Buckhannon Bd. & Care Home, Inc. v. W.V. Dep't of Health & Hum. Res., 532 U.S. 598, 603 (2001).

"Fee applicants 'bear the burden of demonstrating the reasonableness of each element of their fee request.'"  Loving v. Internal Revenue Serv., No. 12-385 (JEB), 2014 WL 12778284, at *7 (D.D.C. Sept. 19, 2014) (quoting Am. Petroleum Inst. v. Env't Prot. Agency, 72 F.3d 907, 912 (D.C. Cir. 1996)).  "In determining whether fees are reasonable, courts ordinarily focus on two questions: (1) whether the attorneys charged a reasonable hourly rate and (2) whether the time attorneys logged on the case was reasonable—i.e., did the attorneys waste or otherwise unnecessarily spend time on the matter."  Id. (quoting In re Donovan, 877 F.2d 982, 990 (D.C. Cir. 1989) (per curiam)); see also Does I, II, III v. District of Columbia, 448 F. Supp. 2d 137, 140 (D.D.C. 2006) (emphasizing that the Court must exclude hours that are "excessive, redundant, or otherwise unnecessary" (quoting Palmer v. Rice, No. CIV.A.76–1439, 2005 WL 1662130, at *9 (D.D.C. July 11, 2005)).

A plaintiff seeking to establish that her attorneys charged a reasonable hourly rate may do so by evidence demonstrating "the attorneys' billing practices; the attorneys' skill, experience, and reputation; and the prevailing market rates in the relevant community."  Covington v. District of Columbia, 57 F.3d 1101, 1107 (D.C. Cir. 1995).  To further establish the prevailing market rate, "a fee applicant must 'produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'"  Eley v. District of Columbia, 793 F.3d 97, 100 (D.C. Cir. 2015) (quoting Blum v. Stenson, 465 U.S. 886,

895 n.11 (1984)); see also Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319,

1325 (D.C. Cir. 1982) ("An applicant is required to provide specific evidence of the prevailing

community rate for the type of work for which he seeks an award.").  As this Court has observed,

"[a]scertaining the prevailing market rate is 'inherently difficult.'"  Taylor v. District of

Columbia, 205 F. Supp. 3d 75, 83–84 (D.D.C. 2016) (Walton, J.) (quoting Eley, 793 F.3d at

100).  "Nonetheless, the court must determine 'the prevailing hourly rate in each particular case

with a fair degree of accuracy.'"  Id. at 84 (quoting Nat'l Ass'n of Concerned Veterans, 675 F.2d

at 1325).

To aid in the Court's determination, fee applicants may "submit attorney[s'] fee matrices

as one type of evidence that 'provide[s] a useful starting point' in calculating the prevailing

market rate."  Eley, 793 F.3d at 100 (second alteration in original) (quoting Covington, 57 F.3d

at 1109).  For cases, as here, which involve "complex federal litigation," Eley, 793 F.3d at 100,

courts in this Circuit have regularly applied "the 'Laffey Matrix,' a schedule of fees based on

years of attorney experience that was developed in Laffey v. Northwest Airlines, Inc., 572 F.

Supp. 354 (D.D.C. 1983), rev'd on other grounds, 746 F.2d 4 (D.C. Cir. 1984)[.]"  Judicial

Watch v U.S. Dep't of Just., 774 F. Supp. 2d 225, 232 (D.D.C. 2011); see, e.g., Covington, 57

F.3d at 1105–11.  To account for inflation, "competing updated Laffey Matrices have [been]

developed[.]"  Eley, 793 F.3d at 101.  Two of these updated versions are relevant here: the LSI

Laffey Matrix, which the Court has previously found to set reasonable rates for complex federal

litigation, see, e.g., True the Vote, Inc. v. Internal Revenue Serv., No. 13-734 (RBW), 2020 WL

5656694, at *7–9 (D.D.C. Sept. 23, 2020) (Walton, J.); and the Fitzpatrick Matrix, a new fee

matrix issued by the United States Attorney's Office for the District of Columbia in November

2021, see J.T. v. District of Columbia, 652 F. Supp. 3d 11, 24–27 (D.D.C. 2023) (providing an overview of the competing matrices).

Because fee matrices are "somewhat crude," Covington, 57 F.3d at 1109 ("[T]he Laffey matrix, for example, lumps attorneys with four to seven years of experience in the same category; attorneys with eleven to nineteen [years of experience] also share the same hourly rate."), a fee applicant may supplement the proffered fee matrix with additional evidence. Such additional evidence may include "surveys to update the matrix; affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases; and evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases." Id.

Once an applicant meets her initial burden, there is a presumption that the product of the number of hours billed and the hourly rates applicable to the billable hours constitutes "the reasonable fee." Id. (quoting Blum, 465 U.S. at 897). Then, the burden shifts to the opposing party to "provide specific contrary evidence tending to show that a lower rate would be appropriate." Id. at 1110 (quoting Nat'l Ass'n of Concerned Veterans, 675 F.2d at 1326).

Here, the plaintiff "has been awarded some relief by the [C]ourt[,]" Buckhannon Bd. & Care Home, Inc., 532 U.S. at 603—i.e., the jury's partial verdict in her favor, as well as the Court's award of various forms of equitable relief requested by the plaintiff—and she therefore is a "prevailing party" eligible to receive an award of reasonable attorneys' fees under Title VII, see 42 U.S.C. § 2000e-5(k). Accordingly, the Court must assess whether the plaintiff has met her burden of establishing that her requested award of attorneys' fees is reasonable. The Court will assess the reasonableness of the requested fees for each of the plaintiff's attorneys—Mr. Shea and Mr. Patton—in turn.

In regards to the requested award of fees for Mr. Shea, the plaintiff argues that "[t]he time devoted to [the p]laintiff's representation . . . has been economical throughout[,]" and that Mr. Shea is entitled to the highest hourly rates under the Laffey and Fitzpatrick matrices in light of his "over 40 years of experience in practice in Washington."  Pl.'s Mot. at 19; see also Pl.'s Suppl. Mot., Ex. (Supplemental Declaration of Timothy B. Shea ("Shea Suppl. Decl.")) at 1–2, ECF No. 120-2.  The Court must decide which—if either—matrix to apply in calculating the reasonableness of the requested rates.  While the Fitzpatrick Matrix is newer, other members of this Court have concluded—in comparing the LSI Laffey and Fitzpatrick matrices—that the Fitzpatrick Matrix is a superior reflection of reasonable rates.  See Brackett v. Mayorkas, No. 17-988 (JEB), 2023 WL 5094872, at *4 (D.D.C. Aug. 9, 2023) (collecting cases); see also J.T., 652 F. Supp. 3d at 31–36 (concluding that the Fitzpatrick Matrix "offers a superior measure of the prevailing market rate for complex federal litigation" in the District of Columbia because (1) its "underlying dataset has the clear benefit of being much more recent[;]" (2) it "rests on a more robust dataset" than the LSI Laffey Index; and (3) it "calculate[s] rates in 36 individual experience categories[]" compared to the Laffey Matrix's "five bands of experience"); Louise Trauma Ctr. LLC v. Dep't of Homeland Sec., No. 20-1128, 2023 WL 3478479, at *4 (D.D.C. May 16, 2023) (noting that "Fitzpatrick Matrix rates presumptively apply" in "complex federal litigation").  This Court agrees with its colleagues and therefore concludes that the Fitzpatrick Matrix measure applies in assessing all of the fees requested by the plaintiff.

Based on the plaintiff's evidence regarding Mr. Shea's skills, experience, and billing practices, the Court concludes that the plaintiff has met her burden of establishing the reasonableness of the billing rate sought for her legal services.  See Covington, 57 F.3d at 1107.  Mr. Shea "has over 40 years of experience in practice in Washington[,]" and he has received the

highest rates under the Laffey Index in other matters, including in the Equal Employment

Opportunity Commission (EEOC) challenge that preceded this case. See Pl.'s Additional Exs.,

Ex. 3 (Declaration of Timothy B. Shea ("Shea Decl.")), Ex. 2 (Alavi v. Lobo, Award of

Attorney's Fees and Costs), ECF No. 109-4 (concluding that Mr. Shea "is one of the 'very

experienced federal court litigators' as defined in the Laffey Matrix").  Further, upon review of

Mr. Shea's billing records, the Court similarly concludes that the plaintiff has met her burden of

establishing the reasonableness of the hours expended by Mr. Shea.[10]  In light of these findings,

the Court concludes that the plaintiff's request for the award of fees for Mr. Shea is reasonable.

In regards to the requested award of fees for Mr. Patton, the plaintiff seeks a total of

$124,051.75 for 185 hours of legal services.  See Pl.'s Mem. at 19 (147.5 hours prior to August

31, 2020); Pl.'s Suppl Mot. at 3 (37.5 hours after that date).  The plaintiff argues that "[t]he time

devoted to [the p]laintiff's representation in this case has been economical throughout[,]" Pl.'s

Mem. at 19, and specifically that the plaintiff's counsel "has been sole counsel in this case until

weeks before trial" despite the defendant "routinely ha[ving] [ ] at least two attorneys working

on this case at every stage[,]" id.  The defendant raises concerns regarding the presence of

another senior attorney during the trial, asserting that "[f]ees [ ] sought for the time of Robert J.

Patton, Jr." are unwarranted because Mr. Shea "did not require an attorney with [over] 31[] years

of experience to assist at trial."  Def.'s Opp'n at 13; see also Def.'s Suppl. Fees Opp'n at 4

(arguing that "Mr. Shea certainly did not need another senior lawyer to assist with a fees motion

and the subsequent hearing and filing[]" given his own experience as a litigator and Mr. Patton's

billing records indicating that he spent much of that time "reviewing Mr. Shea's work and

---

[10] Importantly, the defendant does not oppose the award of reasonable fees for Mr. Shea's services prior to, or following, August 31, 2020, but rather opposes the calculation of such fees at current rates, see infra section III.D.3.

providing comments to him").  The plaintiff did not respond to these objections in her reply in support of either of her motions.  See generally Pl.'s Reply; Pl.'s Suppl. Fees Reply.

Although the defendant does not ultimately challenge the requested fee amount for Mr. Patton's services, see Def.'s Opp'n at 13; Def.'s Suppl. Fees Opp'n at 4, the Court must nonetheless determine whether the plaintiff has satisfied her burden to justify the requested rate for Mr. Patton's services, see Ashraf-Hassan v. Embassy of Fr. in the U.S., 189 F. Supp. 3d 48, 56 (D.D.C. 2016) ("[B]ecause the burden lies with [the p]laintiff to justify the rate, the Court must nonetheless determine for itself whether she has done so.").

Here, according to the Patton Declaration, Mr. Shea "asked [Mr. Patton] to assist him in what he anticipated to be a demanding trial[,]" Pl.'s Additional Exs., Ex. 1 (Declaration of Robert J. Patton, Jr. ("Patton Decl.")) ¶ 19, ECF No. 109-1, and Mr. Patton "reviewed and assisted in responding" to "numerous filings" after he became involved in the case, id. ¶ 20.  At trial, Mr. Patton "acted as [the p]laintiff's co-counsel[,] . . . including appearing every day for trial and sharing feedback and providing assistance in preparation" for the following days of trial.  Id. ¶ 21.  Mr. Patton also assisted "in meeting with [the d]efendant on relief and [i]n responding to [the d]efendant's Motion for [a] New Trial."  Id. ¶ 22.  The plaintiff's supplemental motion includes a second declaration from Mr. Patton, which includes as an exhibit another set of time records, but no further explanation of Mr. Patton's involvement in the case after the conclusion of the trial.  See generally Pl.'s Suppl. Mot.  These time records relate primarily to reviewing and commenting on various filings, editing Mr. Shea's drafts, and preparing Mr. Shea for oral argument.  See generally Pl.'s Suppl. Mot., Ex. (Shea Suppl. Decl.) (detailing hours from September 1, 2020 to December 31, 2023).  However, as the defendant notes, the plaintiff has provided scant information that the services provided by Mr. Patton, a

veteran attorney, were necessary to support Mr. Shea, himself a veteran attorney.  Indeed, the

plaintiff represents that her counsel "has over 40 years of experience in practice in

Washington[,]" Pl.'s Mot. at 19, and the Shea Declaration, in arguing for the application of the

current highest available Laffey Matrix hourly rates, quotes an administrative judge as stating

that Mr. Shea "is one of the 'very experienced federal court litigators' as defined in the Laffey

Matrix[,]" Pl.'s Additional Exs., Ex. 3 (Shea Decl.) at 4.

Considering the minimal justification submitted in support of the assistance Mr. Patton

provided to Mr. Shea, the Court concludes that the plaintiff has not carried her burden to provide

sufficient evidence for the Court to conclude that the requested fees for Mr. Patton's services are

not "excessive, redundant, or otherwise unnecessary." Does I, II, III, 448 F. Supp. 2d at 140

(quoting Palmer, 2005 WL 1662130, at *9); see Blackman v. District of Columbia, 397 F. Supp.

2d 12, 14 (D.D.C. 2005) (emphasizing that it is the plaintiff's burden to show that "the matter

was appropriately staffed to do the work required efficiently and without duplicative billing[]");

see also Salazar v. District of Columbia, No. 93-452 (GK), 2014 WL 12695696, at *9–10

(D.D.C. Jan. 30, 2014) (rejecting requested fees for two co-counsel because their "experience, in

and of itself, does not justify the work claimed to have been done in [that] case" and because the

plaintiffs "have simply not made a convincing case for the use of these attorneys to provide

additional legal advice").  Accordingly, the Court denies without prejudice this component of

both the plaintiff's motion for equitable relief and fees, as well as the plaintiff's supplemental

motion for fees, so that the plaintiff may renew her request for an award of fees for Mr. Patton's

services and provide additional justification for the award, including why Mr. Shea required the

assistance of another veteran attorney to review and edit filings and prepare for trial and

hearings.

**2.   Whether the Plaintiff Is Entitled to an Award of Administrative Litigation Fees**

First, regarding the plaintiff's entitlement to administrative litigation fees, the defendant asserts that the plaintiff improperly seeks compensation "for work performed not in support of this litigation, but for work prosecuting an earlier EEOC claim that was unsuccessful."  Def.'s Opp'n at 11.  However, as the Court previously indicated during the December 21, 2020 hearing, "the case law is clear that if the administrative process was something that needed to be engaged in . . . to bring a lawsuit[, ]there[ i]s entitlement to recovery for those administrative fees."  Tr. at 68:14–18; see Parker v. Califano, 561 F.2d 320, 333 (D.C. Cir. 1977) (holding that "a federal [d]istrict [c]ourt [ ] ha[s] discretion, in a Title VII action where the federal employee is the prevailing party, to award attorneys' fees that include compensation for legal services performed prior to filing of the judicial complaint"); Kulkarni v. Alexander, 662 F.2d 758, 766 (D.C. Cir. 1978) ("It is settled in this circuit that, if the employee prevails, the attorney's compensation award properly includes legal services rendered at the administrative level before (or after) filing of the court complaint under Title VII.").  And the fact that the plaintiff's EEOC efforts were unsuccessful does not foreclose the Court from awarding fees associated with those efforts:

> [A] litigant who is unsuccessful at a stage of litigation that was a necessary step to her ultimate victory is entitled to attorney[s]'[] fees even for the unsuccessful stage.  After all, it is a rare litigant indeed who doesn't lose some skirmishes on the way to winning the war.  Lawsuits usually involve many reasonably disputed issues and a lawyer who takes on only those battles he is certain of winning is probably not serving his client vigorously enough; losing is part of winning.

Ashraf-Hassan, 189 F. Supp. 3d at 61 (alteration in original) (internal quotation marks omitted); see also id. ("declin[ing] to reduce the fee award on account of [the p]laintiff's lack of success in certain pre-trial motions").  Accordingly, the Court concludes that the plaintiff is entitled to fees associated with the administrative component of the claims she pursued and were ultimately litigated in this case.

### 3.   Whether to Calculate Awardable Fees at Current Rates

Next, regarding the fee rate the Court should apply, the defendant argues that the appropriate attorneys' fees should be calculated at historical rates, rather than at current rates as the plaintiff requests, because "courts 'typically' award fees at rates based on the year in which the work was completed[,]" Def.'s Opp'n at 11, and the plaintiff "does not establish that there was 'delay' justifying rates above what is 'typical[,]'" id. at 12.  The defendant is correct that the general rule is that "courts award fees at hourly rates based on the year in which the work was completed[, i.e.,] historical rates rather than current rates." Craig, 2018 WL 6079512, at *19 (citing Reed v. District of Columbia, 134 F. Supp. 3d 122, 136–37 (D.D.C. 2015), rev'd in part on other grounds, 843 F.3d 517 (D.C. Cir. 2016)).  However, to account for delays in payment of attorneys' fees, courts occasionally increase awardable fees for past years to current hourly rates. See, e.g., Missouri v. Jenkins, 491 U.S. 274, 284 (1989) ("An adjustment for delay in payment[, i.e., applying current rates,] is . . . an appropriate factor in the determination of what constitutes a reasonable attorney's fee"); West v. Potter, 717 F.3d 1030, 1034 (D.C. Cir. 2013) ("If compensation for delay is necessary to provide a reasonable fee, it may be made 'either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value.'" (quoting Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 556 (2010))); Craig v. District of Columbia, 197 F. Supp. 3d 268, 277 n.6 (D.D.C. 2016) (applying the then-current hourly rate to past attorney work to compensate for a delay in payment in a Title VII case).

Here, the Court agrees with the plaintiff that current rates should be used to calculate the attorneys' fee award for both services rendered prior to August 21, 2020 and services rendered

after that date, as contained in the plaintiff's supplemental motion for fees.[11]  "The Supreme Court has condoned the use of current rates in calculating a reasonable fee award in order to account for a delay in payment 'several years after the services were rendered.'"  James v. District of Columbia, 302 F. Supp. 3d 213, 226 (D.D.C. 2018) (quoting Jenkins, 491 U.S. at 283–84).  If the Court "determines that the historic rates . . . do not adequately compensate the plaintiff[] for the expected delay in receipt of payment, it may consider whether the use of current market rates would produce a reasonable fee . . . without generating a windfall for the plaintiff's attorneys."  Murray v. Weinberger, 741 F.2d 1423, 1433 (D.C. Cir. 1984).  The plaintiff is correct that, in regards to the services covered in the plaintiff's motion for attorneys' fees, it "has been at least double the 'several years' standard [that] courts have routinely applied [ ] in cases over five years old."  Pl.'s Reply at 17 (emphasis omitted) (quoting James, 302 F. Supp. 3d at 226).  And, although the passage of time since the services covered by the plaintiff's supplemental motion were rendered is less significant than those covered by the plaintiff's motion for equitable relief and attorneys' fees, there has still been a delay of "several years" since these services were rendered.  James, 302 F. Supp. 3d at 226 (quoting Jenkins, 491 U.S. at 283–84).  Therefore, given the significant passage of time since the services were rendered, the Court will apply the 2023 Fitzpatrick Matrix rates in calculating the attorneys' fees to be awarded.

---

[11] Because of the delay in the Court's disposition of these motions, the Court will apply the Fitzpatrick Matrix rates at the time the plaintiff filed her supplemental motion for fees, i.e., the 2023 Fitzpatrick Matrix rates, to all the requested fees.  However, the Court declines to apply the new 2024 Fitzpatrick Matrix rates because although there were avoidable delays in this litigation, the Court concludes that application of the 2023 rates sufficiently compensate for that delay, and because neither party was responsible for the delay in resolving the plaintiff's fee requests.  See Brackett, 2023 WL 5094872, at *6 (applying the most current rate at the time the motion was filed where both parties were responsible for avoidable delays in the litigation).

### 4.  Whether to Reduce the Award for Fees Due to the Plaintiff's Partial Success

Finally, the defendant argues that the ultimate fee award should be reduced proportionally to the plaintiff's success because the plaintiff "prevailed on Count II (retaliation) but was unsuccessful on Count I (sex discrimination)" and "obtained a little more than half ($175,000) of the statutorily capped damages of $300,000."  Def.'s Opp'n at 12.  The plaintiff responds that the two claims were not distinct enough to warrant a proportional reduction.  See Pl.'s Reply at 15–16.

In Hensley v. Eckerhart, 461 U.S. 424 (1983), the Supreme Court instructed that if a "plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained."  Id. at 436.  The District of Columbia Circuit "has interpreted Hensley to establish a two-step inquiry: 'First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he [or she] succeeded?  Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?'"  Hudson v. Am. Fed. of Gov't Emps., No. 17-2094 (JEB), 2023 WL 4053394, at *8 (D.D.C. June 16, 2023) (quoting George Hyman Const. Co. v. Brooks, 963 F.2d 1532, 1535 (D.C. Cir. 1992)).  "Claims are generally completely unrelated when they are distinctly different in all respects both legal and factual, from [the] plaintiff's successful claims."  Radtke v. Caschetta, 254 F. Supp. 3d 163, 175 (D.D.C. 2017) (quoting Morgan v. District of Columbia, 824 F.2d 1049, 1066 (D.C. Cir. 1987)).  "In such circumstances, no fees may be awarded for the time spent on the unsuccessful claims."  Id.  By contrast, "different claims brought in one lawsuit may be interrelated, i.e., they 'involve a common core of facts' or are 'based on related legal theories' and 'cannot be viewed as a series of discrete claims.'"  Id. (quoting Hensley, 461 U.S. at 435).  "In assessing the fees for related claims, 'a court is to skip the first Hensley inquiry and move to the second.'"  Goos v. Nat'l Ass'n of Realtors, 997 F.2d

1565, 1569 (D.C. Cir. 1993) (quoting Brooks, 963 F.2d at 1537).  In other words, "if successful

and unsuccessful claims share a common core of facts[,] . . . a court should simply compute the

appropriate fee as a function of degree of success."  Brooks, 963 F.2d at 1537.

      Here, the plaintiff's claims are not "distinctly different, in all respects, both legal and

factual[,]" Morgan, 824 F.2d at 1066, such that they may be considered completely unrelated.

The plaintiff is correct that "the discrimination and retaliation counts were closely related in

origin and in [ ] all phases of the case."  Pl.'s Reply at 16.  As the plaintiff accurately describes,

"[t]he retaliation count was stated in the same administrative [Equal Employment Opportunity]

complaint, heard in the same EEOC hearing, with [the] same core of Persian [S]ervice

witnesses[] and the same records related to the discrimination claim."  Id.  Additionally, the

plaintiff's discrimination and retaliation claims in her federal Complaint were based on a

common core of facts.  See, e.g., Compl. ¶ 11 (alleging that the plaintiff's "supervisor, Dominic

Bellone, a male, sexually harassed [the p]laintiff and retaliated against her for protected EEO

activity seeking relief from the harassment"); id. ¶ 15 (describing a meeting on February 5, 2007

that "constituted protected activity in opposition to sex discrimination and harassment" between

"a group of female employees" and "agency supervisors and managers" where the plaintiff was

"an outspoken speaker" "about office harassment by males and Mr. Bellone in particular").

Therefore, because the plaintiff's claims were based on interrelated facts, the Court will not

exclude all fees for time spent on claims that were ultimately unsuccessful.  See Morgan, 824

F.2d at 1066 ("Fees for time spent on claims that ultimately were unsuccessful should be

excluded only when the claims are 'distinctly different' in all respects, both legal and factual,

from plaintiff's successful claims." (quoting Hensley, 461 U.S. at 434)).

The Court therefore turns to Hensley's second inquiry: "whether and how much to reduce the fees based on 'the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." Craig, 197 F. Supp. 3d at 283. The defendant argues for a forty percent reduction in fees for the partial success the plaintiff achieved at trial. See Def.'s Opp'n at 13 (proposing an award of sixty percent of Mr. Shea's fees to reflect partial success at trial); Tr. at 65:16–66:2 (arguing that "[s]ince there[ is] not a break down as to . . . was spent on trying to prove the sex discrimination claim versus the retaliation claim[,] [ ] the [defendant] . . . suggest[s] that [Mr. Shea] be compensated at 60 percent of his requested fees" because the jury "granted in favor of [the] plaintiff on half of the claim" and awarded "what amounts to 58 percent of the compensatory damages"). In reply, the plaintiff maintains that "fee reduction for the unsuccessful discrimination count is unwarranted" because the discrimination and retaliation claims were not distinctly different. Pl.'s Reply at 15 (capitalization omitted).

"When reducing fees for limited degree of success, the Court may reduce fees in a number of ways, such as by eliminating specific hours or reducing the award as a whole." Craig, 197 F. Supp. 3d at 283. "There is no precise rule or formula for making [fee] determinations. . . . The court necessarily has discretion in making this equitable judgment." Hensley, 461 U.S. at 436–37. "While the amount of damages recovered may be relevant to the proper fee award, fees awarded need not necessarily be proportionate to the amount recovered by the prevailing party, and should not be reduced solely to achieve proportionality." Radtke, 254 F. Supp. 3d at 171. In fact, the Supreme Court has "explicitly rejected a default 'mathematical approach' in determining by how much to reduce a fee award." Dickens v. Friendship-Edison P.C.S., 724 F. Supp. 2d 113, 121 (D.D.C. 2010) (citing Hensley, 461 U.S. at 435 n.11). "Nevertheless, the Supreme Court has emphasized that 'the extent of the plaintiff's success is a

crucial factor in determining the proper amount of a [fee] award.'" Thompson v. Int'l Ass'n of

Machinists & Aerospace Workers, 664 F. Supp. 578, 581 (D.D.C. 1987) (quoting Hensley, 461

U.S. at 440); see Craig, 2018 WL 6079512, at *25 ("[T]he difference between the relief obtained

by a plaintiff and the relief sought by that plaintiff is a key factor in determining the proper

success-based fee reduction."). "This evaluation should account for both monetary and equitable

relief sought and obtained." Craig, 2018 WL 6079512, at *25; see Hensley, 461 U.S. at 455 n.11

("[A] plaintiff who failed to recover damages but obtained injunctive relief, or vice versa, may

recover a fee award based on all hours reasonably expended if the relief obtained justified that

expenditure of attorney time."). Therefore, "[a]lthough a substantial disproportionality between

a fee award and a verdict, standing alone, may not justify a reduction in attorney[s]'[] fees, a lack

of litigation success will.'" Radtke, 254 F. Supp. 3d at 173 (quoting McAfee v. Boczar, 738 F.

3d 81, 94 (4th Cir. 2013)).

      In other cases where the plaintiff's success was less significant as compared to his or her

initial claims, courts in this District have reduced the plaintiff's requested fee award by between

twenty and sixty-five percent. See Craig, 2018 WL 6079512, at *27 (concluding that "a

sixty-five percent reduction of [the plaintiff's] fee award [wa]s necessary" in a Title VII case

where the plaintiff "obtained less than ten percent of the compensatory damages the jury could

have awarded, . . . roughly half of the equitable relief sought, albeit not the core relief of a

'career enhancing' dual hat role" but the "jury did vindicate [the plaintiff's] rights" in finding for

the plaintiff on his retaliation claim); Hudson, 2023 WL 4053394, at *8 (finding that a

"decidedly modest cut" of "[twenty percent] to counsel's hours properly accounts for th[e]

limited success" of the plaintiff at trial in a Title VII case where "[h]is Complaint made a series

of sweeping allegations of race discrimination and retaliation, and on that basis sought millions

of dollars in damages" but "[t]he Court dismissed three of the four claims, including two

significant ones[,]" and the jury only returned a verdict for the plaintiff on one out of two

remaining discrimination claims); <u>Craig</u>, 197 F. Supp. 3d at 284 (finding that "a modest

reduction of thirty percent [wa]s warranted" for "the time spent prior to the Court's summary

judgment opinion" in a case asserting claims of discrimination, hostile work environment, and

retaliation where the plaintiff "secured a favorable verdict on two of the claims initially pressed

in her complaint . . . and against only one defendant" and the remainder of the claims were either

dismissed at the motion to dismiss or summary judgment stages); <u>Robinson</u>, 341 F. Supp. 3d

at 120 (concluding that a "modest reduction of fifteen percent [was] warranted" where the

plaintiff had obtained only $750 in non-economic damages at trial out of $1,600,000 sought, was

awarded sixty percent of the requested back pay, and the defendant had "prevailed in part at the

motion to dismiss and motion for summary judgment stages").

Here, the plaintiff prevailed on both claims at the motion for summary judgment stage.

<u>See</u> <u>Alavi</u>, 2018 WL 4828401, at *4–9.  However, the jury found in the plaintiff's favor only on

her retaliation claim, and not her discrimination claim.  <u>See</u> Verdict Form at 1, ECF No. 81.

And, the jury awarded the plaintiff $175,000 in compensatory damages based on its finding that

the plaintiff proved that she was terminated from her employment as retaliation for participating

in protected activity, <u>see</u> <u>id.</u> at 1–2, which is fifty-eight percent of the statutory maximum of

$300,000.  Because "[the plaintiff's] claims were based on interrelated facts, the Court will not

reduce her counsel's hours expended on a claim-by-claim basis, but will instead partially reduce

her fee award." <u>Craig</u>, 197 F. Supp. 3d at 283.  Although the plaintiff obtained approximately

half of the relief she sought, the "time that [the plaintiff']s counsel spent on the unsuccessful

[discrimination] claim[] undoubtedly contributed to the litigation of her [retaliation] claim[]."  <u>Id.</u>

at 284.  Therefore, upon consideration of the record in this case and the decisions of other members of this Court in similar cases, the Court will reduce the plaintiff's fee award by ten percent to account for the plaintiff's partial success at trial while also reflecting "the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." Hensley, 461 U.S. at 435.

In sum, the Court concludes that the plaintiff is entitled to (1) fees generated during the administrative litigation of this case, and (2) attorneys' fees for Mr. Shea, calculated at the highest 2023 Fitzpatrick Matrix rates.  The Court also concludes that a modest ten percent reduction in the award of fees based on the plaintiff's partial success at trial is warranted.  Therefore, in total, the Court concludes the plaintiff is entitled to $889,397.93 in attorneys' fees for Mr. Shea's services up to August 21, 2020, and $56,796.66 in attorneys' fees for the legal services provided by Mr. Shea following that date.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that it must grant in part, deny in part, and hold in abeyance in part the outstanding components of the plaintiff's motion for equitable relief.  Specifically, the motion is granted to the extent the plaintiff seeks (1) reinstatement at the GS-13 level; (2) a post-hoc modification of her official personnel folder resulting in the removal of all records regarding her April 2007 termination and all records that support, evidence, or reference the termination or the rationale for the termination; (3) fees generated during the administrative litigation of this case and an award of $889,397.93 in attorneys' fees, i.e., a ninety percent award of attorneys' fees for Mr. Shea's services, calculated at the highest 2023 Fitzpatrick Matrix rates; and (4) reasonable costs incurred of $26,746.32.  The motion is held in abeyance to the extent it seeks back pay from her April 2007 termination to the date of her reinstatement, pending

supplemental briefing from the parties on the amount of back pay to be awarded consistent with the Court's conclusions in this Memorandum Opinion.  The motion is denied without prejudice to the extent it seeks an award of attorneys' fees for Mr. Patton to provide the plaintiff an opportunity to submit additional justification for the requested award of fees.

The Court also concludes that it must grant in part and deny in part the plaintiff's supplemental motion for fees and costs.  Specifically, the supplemental motion is granted to the extent the plaintiff seeks (1) an award of $56,796.66 in attorneys' fees, i.e., a ninety percent award of attorneys' fees for Mr. Shea, calculated at the highest 2023 Fitzpatrick Matrix rates; and (2) reasonable costs of $264.20.  The supplemental motion is denied without prejudice to the extent it seeks an award of attorneys' fees for Mr. Patton to provide the plaintiff an opportunity to submit additional justification for the requested award of fees.

**SO ORDERED** this 10th day of December, 2024.[12]

REGGIE B. WALTON
United States District Judge

---

[12] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.